DOLORES ALVAREZ ET AL. *v.* ADMINISTRATOR,
UNEMPLOYMENT COMPENSATION ACT, ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued November 7—decided December 9, 1952

*John A. Arcudi,* for the appellants (plaintiffs).

*Harry Silverstone,* assistant attorney general, with whom, on the brief, was *George C. Conway,* attorney general, for the appellee (defendant administrator).

INGLIS, J. The question in this case is whether the unemployment of the plaintiffs was due to a labor

dispute so that pursuant to § 7508 (3) of the General Statutes they are ineligible for benefits on account of that unemployment.

The facts found by the unemployment commissioner may be stated as follows: The seventy-eight union plaintiffs, who are appealing, were, on April 20, 1951, and prior thereto, production employees of the United Cloak Manufacturing Company, Inc., hereinafter referred to as United, of Stamford, Connecticut. They were members of Local 147 of the International Ladies' Garment Workers' Union. The local organization will hereinafter be called the Local and the parent organization the International. The Local was a branch of the Joint Board of Cloak, Suit, Skirt and Reefer Makers' Union, hereinafter denominated the Union, which in turn was an affiliate of the International. United was a sub-manufacturer for Jaunty Juniors, Inc., hereinafter called Jaunty, of New York City. That is to say, United manufactured garments exclusively for Jaunty from cloth furnished by the latter and United's operations, from the bolt of cloth through to the completed garments, were entirely performed in its factory at Stamford independently of any auxiliary processes at Jaunty's plant or any other factory. Supervision of production and maintenance of the plant were in the exclusive control of United. It was United to which the state looked for payment of contributions to the unemployment compensation fund on account of United's employees. Most of those employees were paid on a piece rate basis and, for the merchandise produced, United was paid the cost of the labor which went into the manufacture of the garments plus an agreed allowance for overhead and profit. Jaunty was a manufacturer. It manufactured clothing in its own shop in New York and also

farmed out the production of clothing to a number of outside firms, as it did to United. It was also a jobber.

United was a member of the American Cloak and Suit Manufacturers' Association, Inc., and Jaunty was a member of the Merchants' Ladies' Garment Association, Inc. Each of these associations was the representative of all of its members in their collective bargaining with their respective employees, and they had entered into essentially identical contracts with the Union, as bargaining agent for those employees, and the International. The term of the contracts ran from July 28, 1948, to May 31, 1951. They stated that the parties agreed that "the unit appropriate for collective bargaining and for all other purposes under existing law, is and shall continue to be: all production workers engaged in the crafts . . . employed by all of the members of the aforementioned associations and by all other employers in the Metropolitan District in contractual relations with the Union." The effect of this was that the production employees of United and the production employees of Jaunty were to be considered as members of the one bargaining unit.

The contracts recognized that piece rates to be paid to employees of sub-manufacturers would have to be agreed upon for each style of garment at the time the style was designed and ordered. They contemplated that if the same style was manufactured by the manufacturer in his own plant the piece rates therefor should be the same there as they were in the sub-manufacturer's plant. Accordingly, the contracts provided that in the adjustment of piece rates the jobber or manufacturer, the representatives of the workers of his inside and contractor's shops and a representative of the Union should participate and

that the member of the employers' association, i. e. the sub-manufacturer, might also be present for the purpose of settling his overhead. It was further provided that piece rates on identical garments manufactured by a manufacturer in his inside shop and in the shops of his sub-manufacturers should be settled at the same time. The contracts contained the further provision that a manufacturer should pay to his sub-manufacturer at least an amount sufficient to enable the sub-manufacturer to pay to his workers the wages agreed upon and in addition a reasonable amount to cover his overhead. It was customary in practice for the jobber or manufacturer to agree upon piece rates with the Local, but such an agreement was not binding and work under it was not supposed to be started until it was approved by the Union.

Early in April, 1951, during a seasonal shutdown, negotiations were started to determine the piece rates to be paid in United's plant in manufacturing for Jaunty two new styles of garment to be known as Nos. 927 and 930. Pursuant to the contracts and in accordance with custom, these negotiations were had on United's premises between a representative of Jaunty and representatives of the Local. The negotiations failed and Jaunty discontinued efforts to come to an agreement. Thereafter, United, acting as the agent of Jaunty, renewed the discussion and it and the Local reached a mutually satisfactory settlement of piecework rates on the two styles of garments. These piece rates did not reduce any employee's pay below the minimum earnings computed on an hourly basis as provided in the contract. On April 16, the shop chairman of the Local notified the business representative of the Union in New York that the rates had been agreed upon. The busi-

ness representative did not advise the Local that these rates were unsatisfactory, and work on the production of the styles in question, which had been begun, was continued.

On Friday, April 20, the business representative of the Union, acting upon instructions from his superiors in the Union, advised the shop chairman of the Local that the piece rates were not satisfactory and ordered the members of the Local to stop work immediately and not to return to work until new piecework rates on styles Nos. 927 and 930 had been agreed upon between Jaunty and the Union. Pursuant to this order, the plaintiffs stayed away from work from April 23 until May 29. By the latter date piece rates on styles Nos. 927 and 930 had been agreed upon between Jaunty and the Union and the plaintiffs returned to work. The rates finally determined were somewhat higher than those agreed upon between United and the Local. At the time the plaintiffs quit work, there was sufficient work on styles Nos. 927 and 930 at United to keep them employed at full time for an indefinite period, and, except for the stoppage of work by the plaintiffs, United would have continued their employment at the piece rates theretofore agreed upon.

The plaintiffs made claim for unemployment benefits for the period from April 23 to May 29. The unemployment commissioner concluded that the unemployment of the plaintiffs during that period was caused by the dispute over piece rates between Jaunty and the Union, in which the Union had authority to represent the Local, that this dispute was a labor dispute, and therefore that the plaintiffs, being members of the Local, were ineligible for compensation. He accordingly upheld the administrator's denial of benefits to the plaintiffs. Upon

appeal, the Superior Court rendered judgment affirming the commissioner's decision. From that judgment this appeal has been taken.

The correctness of the commissioner's decision depends upon whether the provisions of § 7508 (3)[1] of the General Statutes are applicable to the facts of this case. The contention of the plaintiffs is that the statute is not applicable for three reasons: (1) Upon the facts as found there was no labor dispute; (2) if there was, it did not exist at the factory, establishment or other premises at which they were employed; and (3) their unemployment was due to a lockout.

For the meaning of the term "labor dispute" as it is used in § 7508 (3), we must look to the definition contained in the statutes relating to injunctions in labor disputes. *Conte* v. *Egan*, 135 Conn. 367, 371, 64 A.2d 534. It is there stated: "[T]he term 'labor dispute' shall include any controversy concerning terms or conditions of employment . . . or any con-

---

[1] "Sec. 7508. DISQUALIFICATIONS. An individual shall be ineligible for benefits . . . (3) during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, or at a factory, establishment or other premises operated by his employer in the state of Connecticut, provided the provisions of this subsection shall not apply if it shall be shown to the satisfaction of the administrator that (a) he is not participating in or financing or directly interested in the labor dispute which caused the unemployment, and (b) he does not belong to a trade, class or organization of workers, members of which, immediately before the commencement of the labor dispute, were employed at the premises at which the labor dispute occurred, or at a factory, establishment or other premises operated by his employer in the state of Connecticut and are participating in or financing or directly interested in the dispute; provided any individual whose unemployment is due to a lockout shall not be disqualified, unless the lockout results from demands of the employees, as distinguished from an effort on the part of the employer to deprive employees of some advantage they already possess."

troversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee." General Statutes, § 7408 (c). In claiming that the dispute which caused the disruption of employment in this case was not a labor dispute, the plaintiffs contend that it was not a dispute between United and its employees but rather a dispute between the Local and the Union. They point out that United and the Local were no longer quarreling about piece rates. The dispute, they urge, was between the Local and the Union as to whether those piece rates should be approved and therefore go into effect. That contention is specious. The commissioner did not find that it was a controversy between the Local and the Union which caused the continuing unemployment. He did find that the unemployment was due to the dispute between the Union and Jaunty. In this controversy, by virtue of the employer-union and the jobber-union contracts, Jaunty was negotiating as agent for United and the Union was negotiating as agent for the Local. In reality, therefore, the controversy was between the Local and United. In any event, it is not essential under the statute that the disputants stand in the proximate relation of employer and employee. A controversy is a labor dispute if it is one concerning terms or conditions of employment. The controversy in the present case, involving as it did the matter of wages, surely concerned that subject. Moreover, under the statute a controversy is also a labor dispute if it arises "out of the respective interests of employer and employee." The rate to be paid the plaintiffs for piecework was obviously a matter of interest to them as employees. It was also of interest to their employer, United, in that it would

have to pay wages on the basis of that rate and also in that the rate was an element of cost of production upon which United's overhead and profit would be figured in arriving at the total charge to be made to Jaunty for each garment produced.

The plaintiffs make the further contention that this was not a labor dispute because the purpose of the parties in arriving at an agreement as to uniform piece rates for the manufacture of similar garments throughout the metropolitan district was primarily to stabilize the industry. Their argument is based entirely upon *Allen Bradley Co.* v. *Local Union No. 3,* 325 U.S. 797, 65 S. Ct. 1533, 89 L. Ed. 1939. In that case the United States Supreme Court held that, in spite of the provisions of the Clayton Act, the Norris-LaGuardia Act and the Wagner Act restricting the issuance of injunctions in labor disputes, an injunction should issue against a labor union restraining it from combining with manufacturers and contractors in the electrical business in New York City to fix prices and exclude competition in violation of the Sherman Anti-Trust Act. The plaintiffs argue that, since the illegal combination enjoined had been effectuated by strikes and boycotts by the union, it follows that the holding of the case is that, when a labor union engages in a controversy the issue of which is designed to stabilize an industry and only incidentally to determine working conditions, that controversy is not a labor dispute, otherwise the issuance of the injunction directed by the Supreme Court would have been forbidden by law. The opinion in the case makes it clear that such is not the holding of the court. It says (p. 809) : "But when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent

all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts." The court directed (p. 812) a modification of the form of the injunction originally issued by the District Court to the end that it would enjoin only those activities in which the union joined with any person, firm or corporation which was a nonlabor group and struck from the injunction the prohibition of all other activities which the laws against injunctions against labor union activities provided should not be enjoined. It is clear, therefore, that the *Allen Bradley Co.* case offers no basis for the contention that the controversy in the present case was not a labor dispute simply because it arose out of the Union's attempt to stabilize piecework rates throughout the industry. The unemployment commissioner was correct in sustaining the finding of the administrator that the controversy which caused the unemployment of the plaintiffs was a labor dispute.

Under the disqualifying statute, the labor dispute which renders an employee ineligible must exist "at the factory, establishment or other premises at which he is or has been employed, or at a factory, establishment or other premises operated by his employer in the state of Connecticut." § 7508 (3); see *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 126, 55 A.2d 732. The plaintiffs argue that the dispute in this case did not exist at United's factory in Stamford but at the plant of Jaunty in New York. This contention confuses the locus of the substance of the dispute with the locus of the negotiations looking to a settlement of it. The controversy concerned wages to be paid at United's factory. The subject matter of the dispute was, therefore, at the factory at which the plaintiffs were employed.

The third claim of the plaintiffs is that they are taken out of the disqualification of employees involved in a labor dispute because they were the victims of a lockout. This claim is untenable. Although it is true that an employer may accomplish a lockout by imposing conditions of employment which his employees could not in reason be expected to accept (*Almada* v. *Administrator,* 137 Conn. 380, 389, 77 A.2d 765), no such terms were imposed upon the plaintiffs in this case. There is no finding that the terms of employment offered to the plaintiffs were so unreasonable that they could not reasonably have been expected to accept them. On the contrary, it is found that they had accepted them. The suggestion made by the plaintiffs that United was in no position to offer the plaintiffs work because the employer-union contract contemplated that no work should be started on a new style until the piece rates were agreed upon by Jaunty and the Union is not pertinent. The fact was that United did offer work and apparently intended to continue to offer work for an indefinite time. The cessation of work resulted not from any lack of work but from the voluntary stoppage of work by the plaintiffs. There is no support for the claim that the plaintiffs' unemployment was caused by a lockout.

There is no error.

In this opinion the other judges concurred.