37 N.J. Super. 236 (1955)
117 A.2d 137
FREDERICK C. MORTENSEN, ET AL., APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, AND BETHLEHEM STEEL COMPANY, SHIPBUILDING DIVISION, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 27, 1955.
Decided October 13, 1955.
*237 Before Judges CLAPP, JAYNE and FRANCIS.
Mr. Abraham L. Friedman argued the cause for appellants (Messrs. Rothbard, Harris & Oxfeld, attorneys).
Mr. George J. Miller argued the cause for respondent Board of Review, etc.
*238 Mr. Charles Danzig argued the cause for respondent Bethlehem Steel Company, etc. (Messrs. Riker, Emery & Danzig, attorneys; Mr. Dickinson R. Debevoise, on the brief; Messrs. Cravath, Swaine & Moore (of New York bar), of counsel).
The opinion of the court was delivered by FRANCIS, J.A.D.
Appellants, employees of the Bethlehem Steel Company, Shipbuilding Division, were adjudged disqualified from unemployment compensation benefits by the Board of Review, Division of Employment Security. The denial was predicated upon a determination that the cessation of their employment was due to a stoppage of work which existed because of a labor dispute.
The pertinent statute, R.S. 43:21-5, provides that:
"An individual shall be disqualified for benefits:

* * * * * * * *
(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed; * * *."
The plaintiffs' union had a collective bargaining contract with the employer. It was to expire on June 23, 1954. Section 1 of Article 24 thereof provided that:
"Either party may on any day between April 13, and April 23, 1954, give notice to the other party of the desire of the party giving such notice to negotiate with respect to the terms and conditions of a new agreement on wages, rates of pay, hours of work and other conditions of employment * * *. If the parties shall not agree with respect to any of such matters (including pensions and insurance) by midnight of June 23, 1954, either party may thereafter resort to strike or lockout as the case may be in support of its position in respect of such matters * * *."
On April 15, 1954 the union gave the required 60-day notice of its intention to seek a new agreement involving a basic wage increase, increases in incentive pay rates, holiday pay, overtime pay and shift differential pay. The exact form of the notice does not appear but in referring to it at the hearing the Chairman of the Board said:
*239 "Then a strike notice was given?
Mr. Rothbard: Right. Sixty days' notice was given April 15th, I guess, because the contract was to expire June 23."
Negotiations began on the various new demands of the union but by June 23 the parties were still in dispute with respect to them. On that day, the union wrote the employer:
"You have advised us that your customers may be reluctant to let to your Companies, and your Companies may be reluctant to accept contracts for repair and other work at your Yards, if our members shall be free to strike on June 24, 1954. You have assured us that your Companies will continue in good faith the serious bargaining for new agreements with our Union, and that you will devote as much time thereto as reasonably possible to assure substantial and rapid progress in such bargaining and the working out of new agreements at the earliest possible date.
Consequently, in order to enable your Companies to obtain work and thus keep our members employed, while at the same time affording our respective negotiating committees an opportunity to continue zealous efforts to arrive at new agreements, our Union has, in reliance upon your aforesaid assurances, decided that it will not call on our members to strike at your Yards prior to July 23, 1954, nor without giving you 15 calendar days' written notice of our intention to do so, provided that your Companies will, in return, during this period continue to afford our Union and the employees all the benefits, conditions, procedures, and practices presently provided for and obtaining under the Agreements and otherwise. * * *."
The differences not having been settled, on July 7 the union again wrote to the company as follows:
"This is to give you notice, in accordance with our letter to you of June 23, 1954, of our intention to call on those of our members who are employed by you to strike on July 23, 1954, unless, before that date, agreement upon new collective bargaining contracts has been reached by your Companies and our Union."
Efforts to compose the various issues continued throughout the summer and an accord was reached finally on September 18. Ratification thereof by the union membership took place on September 25 and it is undisputed that the company's business returned to normal on September 27.
No strike occurred on July 23 or at any time. However, the threat to do so contained in the notice of July 7 was not *240 recalled or modified. During the period intervening between July 23 and September 18 (when the representatives of the parties adjusted their differences) matters proceeded on a day-to-day basis with the union free to strike at will. Unrest existed among the men at the shipyard, with some sporadic, improper incidents taking place, such as refusal of members of a day shift to work overtime, the quitting of the day shift between 3:00 and 3:30 P.M. to attend a union meeting, and then the failure of all but a few members of the night shift to report for work. The next morning after this failure, the day shift gathered in groups outside the yard and did not enter for work until after the president of the local involved advised them to go back to their jobs. The incidents were not authorized by the union officials.
The Board of Review found that as the result of the strike threat of July 7:
"(a) The employer refused to accept ship repair work on which it was required to guarantee a delivery date, incurring a penalty if it failed to meet that date. * * * (b) Other work was withheld by customers, without any action by the employer because the customers knew that a strike might occur and feared that their work might be delayed."
As a consequence of this loss of work, it was necessary to lay off a sizeable number of employees between July 23 and September 27. The unemployment compensation claims of all of the plaintiffs in this action arose during that period.
Considerable oral and documentary evidence was introduced to show the substantial character of the ship repair work known to have been lost because of the strike threat and the sharp reduction in the working force between July 23 and September 27 in comparison with other periods. In this connection it may be noted that in 1953, in the nine weeks beginning July 24 and ending the week of September 18, the average weekly number of employees was 929; in the comparable 1954 nine-week period, the weekly average was 287. It was shown also by impressive testimony that on the basis of the past record of the company, the work reasonably *241 to be anticipated in the period in question would have provided adequate employment for all of the plaintiffs.
The Board concluded from all of the evidence adduced (1) that a labor dispute existed between the employer and the union, and (2) that their layoff by the employer was due to a stoppage of work which existed because of the labor dispute.
We agree that in situations like this one, the Board should bar the workers' recovery only after evaluating the proof with care and reaching the conclusion that the prerequisites to disqualification have been established by the greater weight of the evidence. Here, substantial evidence was presented at the hearings from which both of the findings were justified and we discern no reason for a full de novo excursion into that field.
We have concluded, as did the Board, that Ablondi v. Board of Review, 8 N.J. Super. 71 (App. Div. 1950), is applicable and dispositive of the claims. See also Gerber v. Board of Review, 36 N.J. Super. 322 (App. Div. 1955).
The determination of disqualification is affirmed.