FREDERICK C. MORTENSEN, *ET AL.*, APPELLANTS-AP-PELLANTS, v. BOARD OF REVIEW, DIVISION OF EM-PLOYMENT SECURITY, NEW JERSEY DEPARTMENT OF LABOR AND INDUSTRY, AND BETHLEHEM STEEL COMPANY, SHIPBUILDING DIVISION, RESPONDENTS-RESPONDENTS.

Argued March 5, 1956—Decided March 26, 1956.

*Mr. Abraham L. Friedman* argued the cause for appellants (*Messrs. Rothbard, Harris & Oxfeld,* attorneys; *Mr. Samuel L. Rothbard* and *Mr. Friedman* of counsel).

*Mr. Clarence F. McGovern* argued the cause for respondent Board of Review.

*Mr. Charles Danzig* argued the cause for respondent Bethlehem Steel Company (*Messrs. Riker, Emery & Danzig,* attorneys; *Mr. Dickinson R. Debevoise* on the brief).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J.   Appellants, 341 employees at the Hoboken Yard of Bethlehem Steel Company, Shipbuilding Division, were allowed certification, 20 *N. J.* 139 (1955), to review a judgment of the Superior Court, Appellate Division, 37 *N. J. Super.* 236, affirming a determination by the Board of Review, Division of Employment Security. The determination by the Board of Review was that the appellants were disqualified for unemployment compensation benefits by reason of *N. J. S. A.* 43:21–5(*d*) which provides that a claimant shall be disqualified for benefits "For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of

a labor dispute at the factory, establishment, or other premises at which he is or was last employed;   *   *   *."

The claims related to the period between July 23, 1954 and September 27, 1954, when the company and the claimants' union, Industrial Union of Marine and Shipbuilding Workers, CIO, were negotiating the renewal of a collective bargaining agreement which by its terms expired on June 23, 1954. The Union had served a notice in April terminating the contract, but on June 23 gave the company a letter stating that if bargaining "will continue in good faith" the union "will not call on our members to strike at your Yards prior to July 23, 1954, nor without giving you 15 calendar days' written notice of our intention to do so." Collective bargaining continued, but when agreement was not reached by July 7, the union notified the company of its intention to call a strike effective July 23 unless agreement was reached by that date.

Agreement was not reached by July 23, but no strike in fact occurred on that date or at any other time before the differences were composed in a new contract made September 18, effective September 27 following ratification by the union membership.

The operations which continued at the yard throughout the period from July 23 to September 27 were in substantially lesser volume than would otherwise have been the case. The company repairs ships there either on a "bid" or a "negotiated" basis. "Bid" jobs, about 20% of the total, usually require the company's agreement to demurrage provisions which specify a penalty for each day's delay beyond the specified completion date. "Negotiated" jobs, the remaining 80% of the total, are jobs as to which the compensation to be received by the company is determined in negotiations carried on after the work is completed.

The Board of Review found that the diminished work volume which occasioned the claimants' unemployment resulted from the strike threat of July 7 because "(a) The employer refused to accept ship repair work on which it was required to guarantee a delivery date, incurring a penalty

if it failed to meet that date. * * * (b) Other work was withheld by customers [those on a negotiated basis], without any action by the employer because the customers knew that a strike might occur and feared that their work might be delayed."

The Appellate Division concluded that "substantial evidence was presented at the hearings from which both of the findings were justified and we discern no reason for a full *de novo* excursion into that field." 37 *N. J. Super.*, at *page* 241. Our own examination of the record satisfies us that this conclusion was right. It may therefore be taken that a "stoppage of work" in the form of a diminution of the volume of work which would otherwise have been available at the yard came about for the two reasons found by the Board of Review, and further that the actions both of the company and its customers which produced the diminution are to be attributed to the strike threat of July 7 and the resultant uncertainty throughout the period whether or how long the workers would remain on the job. If, in that circumstance, such stoppage was occasioned by a "labor dispute" the disqualification follows although the diminution in volume represents work withheld by the company's customers. The contrary conclusion of the Alabama court in *Gulf Atlantic Warehouse Co. v. Bennett*, 36 *Ala. App.* 33, 51 *So. 2d* 544 (*Ct. App.* 1951), relied upon by appellants, rests upon the requirement of the statute of that state of a showing that the stoppage was "directly" due to the dispute, a provision not appearing in our statute and which we will not imply. *Gerber v. Board, etc., New Jersey Dept. of Labor and Industry*, 36 *N. J. Super.* 322 (*App. Div.* 1955), affirmed 20 *N. J.* 561 (1956).

But appellants insist that a stoppage of work which does not exist because of a strike or lockout is not a stoppage of work which exists "because of a labor dispute" within the meaning of section 5(*d*). Appellants admit that their contention is answered, in language at least, adversely to them in the opinion of the Appellate Division in *Ablondi v. Board of Review*, 8 *N. J. Super.* 71, 76 (1950), where it

was said that the term "labor dispute" "broadly includes any controversy concerning terms or conditions of employment or arising out of the respective interests of employer and employee.  *  *  *  Lockouts as well as strikes have been included." This holding is premised upon the finding that the Legislature purposefully employed the term "labor dispute" in section 5(d) to evince the meaning that disqualification for benefits should follow from a stoppage of work because of any "labor dispute" whether or not accompanied by a "strike" or "lockout," which are merely two of the forms by which a "labor dispute" may be manifested. The policy underlying the choice of the broader term was said to be "to place the State in a completely neutral position without regard to the rightness or reasonableness of the position or demands of the employer or the employees." 8 *N. J. Super.*, at *page* 76. The Illinois court recently found the same policy to underlie the comparable provision of the act of that state. In *Buchholz v. Cummins*, 6 *Ill. 2d* 382, 128 *N. E. 2d* 900, 902 (*Sup. Ct.* 1955), it was said:

"The general purpose of the Illinois Act [*Ill. Rev. Stat.* 1949, c. 48, § 217 *et seq.*], as expressed in section 1, is to relieve involuntary unemployment. However, section 7(d) specifically disqualifies any individual for benefits for any week in which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment at which he is or was last employed. By this provision the Illinois legislature adopted the policy that the State shall not, by payment of unemployment compensation, assist one party to a labor dispute, regardless of fault; and that the State in cases of industrial strife ought not take sides and place blame. This provision was designed to maintain the neutrality of the State in labor disputes. This labor dispute clause is a departure from the general idea of relief from involuntary unemployment. The question of voluntariness in such a case is not the test.  *  *  *  If a labor dispute results in the closing of a plant or factory, the statute does not place the blame, but considers the resulting unemployment as caused by a labor dispute.  *  *  *

The term 'labor dispute,' within the meaning of section 7(d), has been defined as any controversy concerning wages, hours, working conditions or terms of employment.  *  *  *"

■ Appellants urge, however, that the *Ablondi* interpretation of "labor dispute" was erroneous and that our Legisla-

ture in fact intended the term to embrace only a strike or a lockout. It is not denied that in labor relations parlance a labor dispute may exist without a strike or lockout. Nor is it denied that here the contest over the terms of the renewal agreement was a "labor dispute" as commonly understood. The argument is that the Legislature evidenced the suggested restricted import of the term where it appears in the statute by providing, in section 5(c)(2)(A), that the claimant refusing new work is not to be disqualified for benefits "if the position offered is vacant due directly to a strike, lockout or *other labor dispute*"; the insistence on the brief is that under the rule of construction known as "*ejusdem generis,*" see *In re Armour's Estate*, 11 *N. J.* 257 (1953), "other labor dispute" in that section means "a labor dispute of the nature of a strike or lockout, a labor dispute which has open manifestations." The argument is answered by the decision of the United States Supreme Court in *Unemployment Comp. Comm. of Territory of Alaska v. Aragan*, 329 *U. S.* 143, 150, 67 *S. Ct.* 245, 91 *L. Ed.* 136, 143 (1946), cited by the Appellate Division in the *Ablondi* case. In the *Aragan* case also the claimants contended for the restrictive meaning of section 5(d) in the Act of the Territory of Alaska and supported their contention by reference to section 5(c)(2)(A). In finding the argument to be without merit, the court said:

"The term 'labor dispute,' is not defined in the statute. The term appears in the Act in one other connection, however. Section 5(c) (2)(A) provides that benefits under the Act will not be denied any individual, otherwise eligible, who refuses to accept new work 'if the position offered is vacant due directly to a strike, lockout, or *other labor dispute.*' The Social Security Act of 1935 requires that the state or territorial law contain a provision to this effect before the legislation can be approved by the Social Security Board. Obviously, for the purposes of § 5(c)(2)(A), the term, 'labor dispute,' has a broader meaning than that attributed to it by respondents. Unless the Territorial Legislature intended to give a different meaning to the same language appearing in another subdivision of the same section, the term must be given a broader meaning than that contended for by the respondents, for the purposes of § 5(d) as well."

In our recent opinion in *Gerber v. Board, etc., New Jersey Dept. of Labor and Industry, supra,* we approved and applied the construction of section 5(d) pronounced in the *Ablondi* case and, through Mr. Justice Oliphant, pertinently commented:

"We cannot concern ourselves either with the wisdom or the limitations expressly set forth in the disqualifications specifically defined in *N. J. S. A.* 43:21–5(d). Specific conditions under which unemployment compensation can or should be paid where there is a work stoppage as a result of a labor dispute is clearly within the legislative province. This particular section deals with a sensitive area of policy on which there can be a reasonable difference of opinion and our province is merely to interpret and apply it to particular situations as they are presented, keeping in mind the general policy of the act.

\* \* \* \* \* \* \* \*

These disqualification provisions of our statute had their genesis in and are similar to provisions in the Social Security Act, 42 *U. S. C. A.* § 301 *et seq.*, and as pointed out both in *Ablondi v. Board of Review* \* \* \* and by the Appellate Division in this case \* \* \*, our Legislature has refused to pass amendments enlarging or delimiting the restrictions presently in the statute." (20 *N. J.* 566, 567.)

To which we add that evidence is not wanting of appreciation of the fact that any change in this respect is exclusively for legislative determination. The legislative archives include some 13 Senate or Assembly bills submitted since the decision of the *Ablondi* case and designed to amend section 5(d). All failed of passage, including two, Assembly No. 287 of 1951 and Assembly No. 533 of 1953, both of which proposed amendments to substitute the word "strike" for the term "labor dispute" and to limit the period of disqualification to "not exceeding four weeks covering any one strike."

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.