100 N.J. Super. 569 (1968)
242 A.2d 847
FAY E. BURGOON, ET AL., PLAINTIFFS-APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
WILLIAM L. BURNS, ET AL., PLAINTIFFS-APPELLANTS,
v.
BOARD OF REVIEW, DIVISION OF EMPLOYMENT SECURITY, DEPARTMENT OF LABOR AND INDUSTRY, STATE OF NEW JERSEY, AND ARMSTRONG CORK CO., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1968.
Decided May 6, 1968.
*571 Before Judges GOLDMANN, KILKENNY and CARTON.
Mr. Albert K. Plone argued the cause for appellants (Messrs. Plone, Tomar, Parks & Seliger, attorneys).
Mr. Edward A. Kaplan argued the cause for respondent Board of Review, Division of Employment Security, Department of Labor and Industry, State of New Jersey.
Mr. Frederick J. Rohloff argued the cause for respondent Armstrong Cork Co. (Messrs. Archer, Greiner, Hunter & Read, attorneys).
*572 The opinion of the court was delivered by KILKENNY, J.A.D.
These are consolidated appeals by two groups of claimants from final decisions of the Board of Review, holding them disqualified under N.J.S.A. 43:21-5(d) from receiving unemployment benefits during two strike periods in March 1965 at the Armstrong Cork Company plant in Millville, New Jersey, where they had been employed. The Bureau found that their unemployment from March 1, 1965 through March 9, 1965 and from March 18, 1965 through March 28, 1965 was due to stoppages of work which existed because labor disputes at the Armstrong plant, and that the claimants did not come within the exemptions specified in N.J.S.A. 43:21-5(d).
Armstrong manufactures glass containers at its Millville establishment. Its employees belong to several different unions. For example, those engaged in the warehousing and shipping operations, as well as yard truck activities, are members of Teamsters Local Union 676. The automatic machine operators belong to Local 7 of the Glass Bottle Blowers Association of the United States and Canada. The Burns group of 121 claimants is in that local. The production and maintenance workers are members of Local 257. Locals 257 and 7 are both subject to the jurisdiction of the same International Union. The Burgoon group of 689 claimants belongs to Local 257. Each local negotiates its own separate contract with the employer, and each meets separately and has its own set of officers. However, Locals 7 and 257 are in a common International Union, receive aid therefrom in negotiating contracts and contribute twenty-five cents monthly from each member's dues to a common strike fund maintained by the International.

I
The genesis of the first strike was the creation of eight new jobs by Armstrong and its assignment of those jobs to Teamsters Local 676. Local 257 protested this assignment and claimed the jobs for its own members. The eight jobs in this *573 jurisdictional dispute were driving forklift trucks, picking up pallets of ware and transporting them from trailer trains to the company's warehouse operations.
The contract between Local 257 and Armstrong required submission of the dispute to arbitration. This was done and the impartial arbitrator ruled on January 25, 1965 that the eight jobs should be assigned to Local 257. The ruling was binding on the employer but not on the Teamsters Local which was not a party to and had not participated in the arbitration hearing. Thus, the employer found itself caught in the middle of this jurisdictional labor dispute. Armstrong filed an unfair labor practice charge with the National Labor Relations Board in order to resolve the job assignment issue and thus extricate itself from its dilemma.
Meanwhile, the Teamsters Local contract expired on February 28, 1965 and it would not renew or extend the contract unless it was allowed to retain the eight jobs. At 12:01 A.M. on March 1, 1965 the Teamsters Local struck the Armstrong plant and the bulk of its 125 members formed mass picket lines at the entrances to the plant. The strike persisted through March 9, 1965 when a temporary settlement was effected before Judge Madden in the federal court in Camden. The stipulation was agreed upon by all interested parties. The job assignment was left temporarily with the Teamsters Local, pending determination by the N.L.R.B., and a pay rate differential was given Local 257 members. (The N.L.R.B. subsequently affirmed the ruling by the arbitrator and the Teamsters Local appealed from that decision).
There is substantial evidence in the record to support the finding by the Appeal Tribunal and concurred in by the Board of Review that the failure of members of Locals 7 and 257 to cross the picket lines set up by the teamsters union was not voluntary, but was rather due to fear of violence. It was also found that some members of Local 257 joined the picket lines, but their purpose in doing so was not made manifest and was somewhat incongruous. This unexplained *574 picketing by a handful of Local 257 members was without official union sanction. It is not material to the resolution of the issues before us. We mention it only because it is part of the record.
The members of Locals 7 and 257, who had been idled from March 1 through March 9, 1965 by the teamsters union's strike, claimed unemployment benefits for that period. The Appeal Tribunal decided that the members of Local 257 were disqualified under N.J.S.A. 43:21-5(d) because the work stoppage was due to a labor dispute in which they were "directly interested." It ruled, however, that the members of Local 7 were not disqualified from receiving unemployment benefits because they were not involved in the labor dispute, had not participated in it or helped to finance it in any way, and their not crossing the picket lines was involuntary.
The Board of Review agreed with the fact findings of the Appeal Tribunal and its conclusion disqualifying the members of Local 257 because of their direct interest in the labor dispute which caused the work stoppage. However, it held that the members of Local 7 were also disqualified during this first strike period because the members of both Locals 7 and 257 "were all in one grade or class" and by reason thereof disqualified under the provisions of N.J.S.A. 43:21-5(d).
The Burns group in Local 7 and the Burgoon group in Local 257 assert that these decisions by the Board of Review are erroneous. Both groups claim to be entitled to unemployment benefits during their enforced idleness due to the strike of Teamsters Local 676.

AS TO FIRST STRIKE PERIOD  MARCH 1 TO MARCH 9, 1965

A. CLAIMS OF THE MEMBERS OF LOCAL 257 THE BURGOON APPEAL
N.J.S.A. 43:21-5(d) provides in pertinent part:
*575 "An individual shall be disqualified for benefits:

* * * * * * * *
(d) For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory * * *, provided, that this subsection shall not apply if it is shown that:
(1) He is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
(2) He does not belong to a grade or class of workers * * * any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case in which (1) or (2) above applies separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purposes of this subsection, be deemed to be a separate factory, establishment or other premises."
It is obvious that the unemployment of the members of Local 257 during the period of the Teamsters Union strike was due to a stoppage of work which existed because of a labor dispute at the Armstrong factory. It is also clear that the members of Local 257 were "directly interested in the labor dispute which caused the stoppage of work" and by reason thereof not entitled to exemption from the disqualification provision of N.J.S.A. 43:21-5(d).
They argue that the strike was not called by their local union and that they had no labor dispute with their employer, since they had successfully settled their dispute by arbitration. But, in reality, Local 257 generated the labor dispute by protesting the employer's initial assignment of the eight jobs to Teamsters Local 676, by pressing the issue through arbitration and by placing the employer in the middle of a jurisdictional tug-of-war. Their direct interest in this labor dispute is also manifested by their participation in the stipulation of settlement entered into in the federal court, which brought an end to the strike. In that settlement the members of Local 257 were awarded a rate of pay differential as if they were performing the eight jobs, while allowing the members of Teamsters Local 676 to do the work entailed by these jobs pending resolution of the N.L.R.B. proceedings.
*576 We agree with the conclusion of the Board of Review that the direct interest of the members of Local 257 in the jurisdictional labor dispute which caused the stoppage of work and in whose temporary resolution they received tangible benefits disqualified these employees from unemployment benefits under N.J.S.A. 43:21-5(d) during this period of work stoppage.

B. CLAIMS OF MEMBERS OF LOCAL 7 THE BURNS APPEAL
The evidence supports the finding that the members of Local 7 did not participate in or finance and they were not directly interested in the labor dispute which caused the stoppage of work from March 1 through March 9, 1965 when the members of Teamsters Local 676 were out on strike. The jurisdictional issue involved the two contending local unions  676 and 257  with the employer caught in between.
However, the Board of Review, in reversing the Appeal Tribunal as to this aspect of the case, decided that the members of Local 7 were disqualified by reason of N.J.S.A. 43:21-5(d) (2), in that they belonged "to a grade or class of workers" who were "directly interested in the dispute." In other words, the disqualification of the workers, who were members of Local 257 and directly interested in the jurisdictional dispute, effected the disqualification of the members of Local 7, because the latter belonged to the same grade or class of workers as those in Local 257.
Armstrong's glass container factory in Millville is known as a "flow plant". That means that the manufacturing process is a continuous and coordinate one, albeit workers may be housed in separate but connected buildings on the premises. Each function is dependent upon the completion of the preceding one. When one part of the manufacturing process is stopped, the entire operation must necessarily be suspended. The work performed by the production employees, who are members of Local 257, precedes and flows to the automatic *577 machine operators, who belong to Local 7. Though there are separate departments where each group of employees performs its part in achieving the end result, the respective departments cannot be conducted as separate businesses, so as to constitute each a separate factory within the meaning of the proviso in N.J.S.A. 43:21-5(d) (2). The continuous and coordinated flow is from molten glass to finished glass containers by the cooperative performance of the production workers in Local 257 and the automatic machine operators in Local 7.
This combined and integrated effort was the basis for the conclusion reached by the Board of Review that the members of Local 7 were of the class or grade of workers as those in Local 257 who were directly interested in the result of the jurisdictional labor dispute.
In Gerber v. Bd. of Rev., etc., N.J. Dept. of Labor and Industry, 20 N.J. 561 (1956), the Supreme Court pointed out:
"The words `grade or class' in the context of N.J.S.A. 43:21-5(d) obviously was intended to mean and include something more or different than the group of employees directly interested in the dispute, otherwise it would seem to be surplusage." (at p. 568)
An analogous statutory provision was held to "contemplate classes which may include nonorganized workers or members of more than one union." Cameron v. De Board, 230 Or. 411, 370 P.2d 709, 714 (1961). See, too, Westinghouse Elec. Corp. v. Unemployment Comp. B. of R., 165 Pa. Super. 385, 68 A.2d 393 (1949); Dravo Corp. v. Unemployment Compensation Bd. of Rev., 187 Pa. Super. 246, 144 A.2d 670 (1958).
Where, as here, both locals belong to the same International Union, to which each is subject and as to whose efforts each is a beneficiary, the members are of the same grade or class even though they belong to separate locals. Especially is this true where an operation is closely integrated, each function depending immediately upon the completion of the *578 prior one, so that if one stage of the unified assembly line stops the entire operation ceases. See Amico v. Bd. of Rev., Div. of Emp. Sec., 49 N.J. 159, 171 (1967) and the cases from other jurisdictions cited therein. See, too, Basso v. News Syndicate Co., Inc., 90 N.J. Super. 150 (App. Div. 1966).
The fact that the claimants, members of Local 7, bargained separately for a new contract did not, by itself, place them in a different grade or class of employees in view of the closely integrated production line operation at the plant. As the evidence establishes, when one essential part of the operation is stopped, all production necessarily ceases.
We concur in the conclusions reached by the Board of Review as to the first strike period commencing March 1, 1965.

II
The second strike was called by members of Local 257 and was due to a labor dispute with their employer. Their contract had expired on February 28, 1965, but it was extended until March 17, 1965 pending negotiations for a new contract. When negotiations broke down on March 17, Local 257 struck the Armstrong plant on March 18 and set up picket lines. The mere absence of the production workers in Local 257 caused a work stoppage for the automatic machine employees in Local 7. As noted above, the work done by those in Local 257 preceded that done by those in Local 7 in the continuous, coordinate flow of the manufacture of glass containers. The members of Local 7 were not discharged or laid off by the employer, as they now contend, but were simply advised that, without the production workers, it could not operate and, hence, there was no work for them to do. They were to come back when operations resumed. That their jobs were not terminated is manifested by the fact that they all returned to work as soon as the plant was put in operation at the end of the strike.
*579 Moreover, the president of the International Union, to which both Locals 7 and 257 were subject, notified Local 7 that the strike by Local 257 must be recognized as "officially sanctioned" and the members of Local 7 should "honor picket lines" and cooperate to effect a complete shut down of the employer's plant. Out of the common strike fund, made up from a portion of the monthly dues paid by members of both locals, strike benefits of $18 weekly were paid to members of the striking Local 257. Based thereon, the Appeal Tribunal and the Board of Review concurred in finding that the members of Local 7 had participated in and helped to finance Local 257's strike, thereby disqualifying its members from unemployment benefits under N.J.S.A. 43:21-5(d). The Board of Review also found the members of Local 7 disqualified because they were of the same "grade or class" as the members of Local 257, the striking union.
The members of the striking Local 257 concede that they were disqualified during the period of their own strike.
We agree with the holding that, since work would have been available to the members of Local 7 except for the strike by Local 257, the proximate cause of their unemployment was the labor dispute stoppage rather than lack of work. Ablondi v. Board of Review, 8 N.J. Super. 71, 79 (App. Div. 1950); Mortensen v. Bd., etc., Dept. of Labor and Industry, 37 N.J. Super. 236 (App. Div. 1955), affirmed 21 N.J. 242 (1956).
Also persuasive is the fact that the claimants in Local 7 belonged to the same International Union as did their co-workers in Local 257 and their dues were used, at least in part, to finance the strike. Wasyluk v. Mack Manufacturing Corp., 4 N.J. Super. 559 (App. Div. 1949); Gerber v. Bd. of Rev., etc., N.J. Dept. of Labor and Industry, 20 N.J. 561 (1956). "Whether claimant's contribution was small or large is not the test for disqualification under N.J.S.A. 43:21-5(d). * * * Any financing of a labor dispute disqualifies a claimant from receiving unemployment benefits." Soricelli v. Board of Review, etc., 46 N.J. Super. 299, *580 312 (App. Div. 1957). There, a contribution of $1 to a strike fund by a claimant disqualified him from receiving unemployment benefits.
Finally, there was a finding that the claimants in Local 7 were directly interested in the outcome of Local 257's contract negotiations in that the terms and conditions in such new contract were material to their own contract negotiations.
There was substantial evidence in the record to support the findings and conclusions of the administrative agency. Since the members of Local 7 did not meet the requirements of the escape clause of N.J.S.A. 43:21-5(d), they were disqualified under the statute from receiving unemployment benefits during the second strike period commencing March 18, 1965.
The final decisions under review are affirmed.