MARGARET E. FURBER ET AL. *v.* ADMINISTRATOR,
UNEMPLOYMENT COMPENSATION ACT, ET AL.

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

---

Argued January 4—decided March 7, 1973

*Bruce W. Manternach,* with whom was *Edmund J. Dilworth, Jr.,* of the Michigan bar, for the appellant (defendant New Departure-Hyatt Bearings Division of the General Motors Corporation).

*Thomas J. Daley,* assistant attorney general, appeared for the named defendant.

*William S. Zeman,* for the appellees (named plaintiff et al.).

MacDonald, J.  This appeal is taken by the defendant New Departure-Hyatt Bearings Division of the General Motors Corporation, located in Bristol, Connecticut (hereinafter called the Bristol Division), from a judgment of the Superior Court in Hartford County which, in effect, sustained a decision of the commissioner of unemployment compensation benefits for the first district.  The commissioner, in ruling that the plaintiffs were eligible to receive unemployment benefits, and the trial court, in dismissing the Bristol Division's appeal therefrom, concluded that the unemployment of the plaintiffs for which they received compensation was not due to the existence of a labor dispute at the Bristol Division, and the sole issue presented by this appeal is whether the court erred, on the facts involved, in reaching that conclusion.

The findings of fact of the commissioner as corrected first by the commissioner and later by the trial court have not been attacked and indicate that the plaintiffs are members of the United Automobile Workers, Local 626 (hereinafter called the Local Union), headquartered in Bristol, which is an affiliate of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter called the International Union).  The national agreement between the International Union and the General Motors Corporation (hereinafter called G. M.) included the employees of the Local Union in its coverage.  They

were employed by the Bristol Division, which is a single and separate factory unit of G. M. and is the only factory in Connecticut owned and operated by G. M. The Bristol Division produces bearings, ball bearings, roller bearings and roller clutches, the bulk of which products were sold to G. M. but a portion of which were sold to the Chrysler Corporation (hereinafter called Chrysler) and the Ford Motor Company (hereinafter called Ford) with no price preference being given to G. M.

The national agreement, which, as we have noted, included in its coverage the employees of the Local Union, expired at midnight September 14, 1970, and the International Union and G. M., on July 15, 1970, commenced negotiations for a new contract, each seeking changes from the existing contract. The Local Union, as well as other local affiliates, made certain requests for changes in the contract and the Local Union to which the plaintiffs belonged was represented on a national committee of the International Union which conducted the negotiations with G. M. Any agreement reached between the International Union and G. M. would be subject to ratification by the International Union and any local agreement between the Local Union and the factory (in this case the Bristol Division), where the Local Union acted as bargaining agent, would be subject to approval by the International Union and G. M.

In August, 1970, the International Union informed G. M. that if no agreement were reached a "selective strike" would be directed against G. M., which meant, it was explained, that certain of the local plants, including the Bristol Division, would continue to operate. The International Union at the same time informed G. M. that no strike would be called against Chrysler or Ford. A strike against

G. M. was called effective at midnight, September 14, 1970. The employees at the Bristol Division continued to work after that date as part of the International Union's "selective strike" strategy which required that employees at G. M. plants continue to work in order to keep Ford and Chrysler, the major competitors of G. M., in production and thereby to increase the union bargaining pressure on G. M. There was no picketing of the Bristol Division during the strike called by the International Union, and the plant continued to function, although at less than full capacity. As a result of the curtailment of orders by G. M. only, a number of employees of the Bristol Division including the plaintiffs were laid off for lack of work on varying dates commencing September 23, 1970. Commencing two weeks after the strike started on September 14, 1970, some of the plaintiffs who were thus laid off obtained loans from the Local Union to ease their economic stress during the pendency of the strike. The moneys of the so-called Strike Fund of the International Union were available as loans to the membership of the Local Union for the payment of personal bills, mortgages, and other items, the loans being repayable out of any funds received as unemployment compensation.

The controlling provisions of the Unemployment Compensation Act are found in § 31-236 (3) of the General Statutes, which provides in relevant part: "An individual shall be ineligible for benefits . . . (3) during any week in which it is found by the administrator that his total or partial unemployment is due to the existence of a labor dispute other than a lockout at the factory, establishment or other premises at which he is or has been employed." Since the issue raised is whether the unemploy-

ment of the plaintiffs was "due to the existence of a labor dispute" at the Bristol Division, the definition of "labor dispute" is of basic importance.

"The Unemployment Compensation Act . . . does not define the words 'labor dispute.' For the meaning of the term, as it is used . . . [here], we must look to the definition contained in the statutes relating to injunctions in labor disputes. *Alvarez* v. *Administrator,* 139 Conn. 327, 333, 93 A.2d 298; *Conte* v. *Egan,* 135 Conn. 367, 371, 64 A.2d 534. The term 'labor dispute' includes 'any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing or seeking to arrange terms or conditions of employment or concerning employment relations, or any controversy arising out of the respective interests of employer and employee, regardless of whether or not the disputants stand in the proximate relation of employer and employee.' " *Bartlett* v. *Administrator,* 142 Conn. 497, 502–3, 115 A.2d 671. This is the identical definition given to the term in our present statutes relating to injunctions in labor disputes. See § 31-112 (c). In determining whether, under the foregoing definition, there was in fact a "labor dispute . . . *at the factory"* (emphasis added), i.e., at the Bristol Division, it is necessary to examine carefully and realistically the underlying facts of this case.

Since under Practice Book § 721 "[t]he testimony printed in the appendices will be deemed to embrace all testimony produced at the trial material to the issues on the appeal," we disregard certain unsupported statements in the defendant's brief concerning the vote of the Bristol Division employees to strike. Evidence printed in the appen-

dices to both briefs, however, adds materially to a fair understanding of the true facts involved in the labor dispute between the two unions and G. M. Clearly, the Local Union was a party to the labor dispute with G. M. as it affected all G. M. employees, including those at the Bristol Division, and was negotiated nationally by the committee of the International Union on which the Local Union was represented and locally by the negotiating committee of the Local Union. In August, 1970, during negotiations of the dispute, the president of the Local Union published a letter to all of its members stating: "We are entering negotiations with great issues to be bargained for: '30 and Out' [retirement on pension after thirty years' service regardless of age], substantial wage increase, better working conditions, etc. It is a time to stand indivisible—and go forward together, for those who are not with us are against us." The president, the strike vote committee and the negotiating committee of the Local Union clearly identified the disputes and negotiations between the International Union and G. M. on the national level with those between the Local Union and local management in a notice urging a strong strike vote on August 20, 1970.[1] This identification is further strengthened by the fact that at least 100 employees who were laid off at the Bristol Division were given loans from the Strike Assist-

---

[1] "No meaningful settlements of issues has [sic] occurred to date in our negotiations—both on the National Contract—and Local Negotiations. The Corporation and Local Management should be made aware that the rank and file members are giving full support to our bargaining proposals—both on a Local and National Level. A strong Strike Vote will add measurably to the effectiveness of our National Negotiating Committee, and our Local Negotiating Committee—in its discussions with the General Motors Corporation, and the Local Management, respectively."

ance Fund of the International Union. And the fact that members of the Local Union were faithfully playing their part in the overall plan of the International Union to pressure G. M., including the Bristol Division, to meet the demands of both unions, including the Local Union, is made crystal clear by the instructions and exhortations by the president of the International Union to members of the Local Union through the principal union paper[2] and in a letter dated September 30, 1970, to all members of local unions who had been ordered to continue to work as part of the selective strike strategy.[3]

The court is well aware of the peculiar situation existing in the automobile industry in this country in that there are but four major producers, namely, G. M., Ford, Chrysler and American Motors. It is equally aware of the tremendous economic pressure that would have been brought to bear on G. M. if the unions involved here had been successful in

[2] " 'This monster [GM] grows more monopolistic' each day . . . . 'An across-the-board strike would quickly halt production of all its competitors in the industry. Such a strike would free General Motors from the competitive pressures otherwise present in a strike against any normal company.' "

[3] "As we all know, if our strike against General Motors Corporation is to succeed, it is essential that its competitors, Ford, Chrysler and American Motors, continue to operate and produce cars and trucks. This is basic to the principle of a selective strike as this principle was unanimously adopted by the UAW International Executive Board and the UAW General Motors Council. Your plant was designated to continue at work because the production is needed to keep Ford, Chrysler and American Motors in operation. . . .

"Nevertheless, it is so essential to the success of the strike that our local union leaders in these plants, with the assistance of the International Union staff, simply must keep discipline among our ranks and keep the plants operating. Should we fail in this effort and should Ford, Chrysler and American Motors production be hampered, or shut down, we would seriously jeopardize the success of our strike against General Motors Corporation."

carrying out their declared purpose of keeping the three principal competitors of G. M. in production by continuing to supply them with the necessary parts produced at Bristol. These basic facts, as well as that of the role played by the Bristol Division as, in actuality, a small department of a larger corporation against which the unions had declared a selective strike, are made graphically clear to the court by the statements of the union leaders referred to and quoted above. Taking into consideration all of the underlying facts as well as the bare narrative of facts, it simply is closing one's eyes to reality to conclude that there was no labor dispute at the Bristol Division. To say, as we frequently have, that the Unemployment Compensation Act should be construed liberally in favor of beneficiaries in order to effectuate its purpose; *Harris* v. *Egan,* 135 Conn. 102, 105–6, 60 A.2d 922, *Reger* v. *Administrator,* 132 Conn. 647, 650, 46 A.2d 844; is not to say that it should be construed unrealistically in order to distort its purpose. " 'It was designed to ameliorate the tragic consequences of unemployment.' " *Reger* v. *Administrator,* supra. And its purpose is "to guard against involuntary unemployment within the limitations prescribed." *Baldassaris* v. *Egan,* 135 Conn. 695, 698, 60 A.2d 120. " 'It was not concerned at all with labor disputes, except in so far as it became necessary to consider them in deciding when unemployment was voluntary and when it was involuntary.' " *Baldassaris* v. *Egan,* supra, 701. Here, the falling-off of orders from strikebound G. M. plants which caused the unemployment of the plaintiffs was brought about, in part at least, by the voluntary acts of the plaintiffs. In *Lanyon* v. *Administrator,* 139 Conn. 20, 33, 89 A.2d 558, involving the refusal of non-

striking employees to cross a picket line, this court stated: "The claim is that the plaintiffs refrained from doing so in order that, by further crippling the activities of their employer, they might advance the cause of the strikers. If such was the fact, the plaintiffs were obviously participating in the dispute and hence were ineligible to receive benefits under the act. When an employee has the choice of crossing the picket line or of refusing to do so because of his adherence to the written or unwritten law of his union, his unemployment, if any, is voluntary. . . . This choice, which members of organized labor are frequently called upon to make, has always been deemed a voluntary one." In discussing the question as to whether the refusal to cross the picket line was motivated by fear of harm, and therefore involuntary, or by the desire to advance the cause of the strikers and therefore voluntary, rendering the plaintiffs participants in the dispute, the court observed in the *Lanyon* case (p. 33): "Since this test is subjective, it may well prove difficult of application, but until the legislature adopts one of a different character we are bound to apply it." So here, applying the subjective test, the plaintiffs obviously remained at work, not out of loyalty to the Bristol Division but in support of their unions, local as well as international, in their disputes with the Bristol Division and G. M. It is clear, from reading the cases cited above, that the policy of construing the act liberally in favor of its beneficiaries is modified to a considerable extent by circumstances such as exist here.

Our definition of a labor dispute as encompassing a situation involving any controversy concerning wages, hours, working conditions, or, broadly speaking, "any controversy arising out of the respective

interests of employer and employee" is in accord with the overwhelming weight of authority. This is apparent from an examination of the authorities collected in 24 Words & Phrases (Perm. Ed.) under "Labor Dispute—In general," pp. 32–36, and "Unemployment compensation," pp. 82–87. Obviously, such controversy existed at the Bristol Division despite the fact that the plaintiffs followed the order of the International Union and continued to work.

"In deciding whether a unit of employment is a separate establishment, the decision must be based on all facts relating to the relationship of the employee to the unit of employment. Factors to be taken into consideration may include the functional integration of the corporation's plants, the general unity of the plants as a whole, and the physical proximity of one plant to other plants, but these factors are not the sole tests. . . . Other factors to consider are the hiring and firing of employees, *the relationships between local unions and national unions,* and the local agreements." (Emphasis added.) *General Motors Corporation* v. *Review Board of the Indiana Employment Security Division,* 255 N.E.2d 107, 113 (Ind. App.). Certainly the relationship between the Local Union and the International Union was a controlling factor for consideration here, and the fact that the layoffs were necessitated by the falling-off of orders from strikebound plants as remote geographically as Michigan and Indiana does not make them any less causally related to the labor dispute in Bristol. See *McGee* v. *Timken Roller Bearing Co.,* 161 N.E.2d 905, 907 (Ohio App.), withholding unemployment compensation benefits from employees of a plant in Zanesville, Ohio, who lost their employment because of failure

of material to be shipped from a strikebound factory in Canton, Ohio, ninety miles away, on the ground that "these claimants lost their employment temporarily 'by reason of a labor dispute (other than a lockout) at the factory establishment or premises at which they were employed' and this in spite of the geographical distance." And the fact that the plaintiffs were not themselves on strike and were at all times willing to continue to work does not indicate that their unemployment was not caused by a labor dispute. See *Mortensen* v. *Board of Review*, 37 N.J. Super. 236, 117 A.2d 137, aff'd, 21 N.J. 242, 121 A.2d 539, involving employees laid off as a result of diminished work volume occasioned by strike threats which never actually materialized.

The case of *General Motors Corporation* v. *Mulquin*, 134 Conn. 118, 55 A.2d 732, cited by the plaintiffs, although similar in some respects to the case before us in that it involved two separate plants of G. M., both located in this state, only one of which went on strike, is distinguishable on its underlying facts in that there was no evidence there that the nonstriking employees of one plant participated in a planned overall strategy to continue work for the sole purpose of coercing acquiescence to their demands on the part of G. M. in the other plant. Such evidence was clearly present here.

In its discussion of the *Mulquin* case, supra, the trial court, in its memorandum of decision, refers to the repeal in 1967 of the so-called New Departure amendment to the Unemployment Compensation Act which had been enacted in 1947 (Sup. 1947, § 1391i) while the *Mulquin* case was pending in this court and which added to the original provision for ineligibility a further exception for labor disputes "at a factory, establishment or other premises operated

by his employer in the state of Connecticut." The repeal of this amendment in 1967; Public Acts 1967, No. 790 § 14; leaving this section of the act in its present form and as it was when considered in the *Mulquin* decision, was interpreted by the trial court as indicating that the very problem presented by the facts of this case had been considered by the legislature and that it had "chosen to make no change in the law which would render the claimants ineligible for benefits." We cannot agree that it was the legislative intent by repealing the New Departure amendment to insulate an employee of a factory from disqualification where his participation in a labor dispute at that factory was an integral part. of a national dispute which eventually caused his unemployment. As we view it, the repeal was intended only to correct the situation where an employee who did not participate in a labor dispute at another factory of his employer was, nevertheless, disqualified because of the participation of the employees of that other factory in a dispute which resulted in his unemployment.

In summary, the disqualification under § 31-236 (3) of the General Statutes has three elements: (1) there must be unemployment, (2) there must be a labor dispute at the local factory, and (3) the unemployment must be due to the existence of the labor dispute. In this case all three elements are present. The fact that the plaintiffs were unemployed is undisputed. The existence of a labor dispute, as defined earlier, at the local factory is evidenced by the facts previously discussed. Finally, the causal connection is present because the local dispute was part and parcel of the national dispute, and it is abundantly clear that the national dispute was the cause of the unemployment.

There is error, the judgment is set aside and the case is remanded with direction to sustain the appeal of the defendant employer.

In this opinion HOUSE, C. J., SHAPIRO and LOISELLE, Js., concurred.

BOGDANSKI, J. (dissenting). I disagree for the reason that the majority opinion goes far afield of our Connecticut statute which controls the decision in this case.

The commissioner in this case concluded that the unemployment of the plaintiffs was not caused by any labor dispute at the factory at Bristol where they were employed and held that they were eligible for benefits. It is undisputed that Bristol did not go on strike, did not do any picketing, and continued to work and maintain production. It is further undisputed that the strikes by the out-of-state G. M. plants caused the shortages at Bristol and the layoffs of the plaintiffs. The question before the trial court and before this court now is whether this conclusion was unreasonable, arbitrary or illegal in view of the subordinate facts found. *Bartlett* v. *Administrator,* 142 Conn. 497, 505, 115 A.2d 671.

The statute that governs is § 31-236 (3), which provides that a claimant shall be ineligible for benefits when it is found by the administrator that his unemployment is due to the existence of a labor dispute at the factory at which he is employed. To render a claimant ineligible under this statute, it must be found by the administrator not only that a labor dispute existed at the factory where he was employed but also that the labor dispute at that factory, only, caused the unemployment. This intent is clear from the legislative history of the statute.

Prior to 1947, the disqualification statute was basically the same as the present § 31-236 (3). In that year, the legislature expanded this statute by adding to it the New Departure amendment which broadened the area in which the unemployment-causing dispute could exist. Sup. 1947, § 1391i. The resulting statute then provided that unemployment due to the existence of a labor dispute at the factory at which a claimant had been employed "or at a factory . . . operated by his employer in the state of Connecticut" would disqualify him from benefits. In 1967, however, the legislature eliminated the quoted phrase, limiting the scope of the statute and restricting the unemployment-causing dispute to the particular factory where the employee worked. In proposing this legislation, the bill's sponsor left no doubt as to its purpose: "[W]e have proposed repeal of the so-called New Departure amendment and a return to the old laws so that employees thrown out of work at a plant of an employer in this state because of a strike or lock out at another plant will not be disqualified." 12 H.R. Proc., Pt. 2, 1967 Sess., p. 4965.

In this case, employees laid off "at a plant of an employer in this state because of a strike . . . at another plant" are being disqualified by the majority of this court. Admitting that the unemployment at Bristol was caused by a falling-off of orders from struck plants in Michigan and Indiana, the majority, nevertheless, asserts that the remoteness of those plants does not make them any less of a causal factor. This approach, which seeks to establish a causal link between the layoffs in Bristol and the labor disputes as they existed at plants elsewhere in the nation, is clearly beyond the scope of the statute, which at no time in its history, even in its

most expanded form, permitted disqualification of a claimant due to factors existing outside of Connecticut.

Moreover, I am not satisfied that the majority has met the causal requirement of the statute by saying that the plaintiffs' voluntary acts, which acts were to continue in their employment, caused their unemployment. Admittedly, the unemployment was caused by a falling-off of orders from struck plants elsewhere, so that the unemployment of the plaintiffs at Bristol was attributable, not to their own voluntary acts of continued employment, but to the independent decisions by members of locals in other states as to how long they would stay away from work. In equating the voluntary acts of the plaintiffs at Bristol with the independent decisions and acts of employees at other factories in other states, the majority has ignored the expressed intent of the legislature in enacting § 31-236 (3) and has further ignored the significance of the statute's history.

The reliance by the majority on *Lanyon* v. *Administrator,* 139 Conn. 20, 89 A.2d 558, is, I believe, misplaced. In *Lanyon,* the question was whether a refusal by the claimants to cross a picket line and go to work constituted participation in the labor dispute. There, the court was required to determine whether an act of unemployment by the claimants, i.e., their refusal to cross the picket line, was voluntary, in which case they would be participants, or involuntary. In attempting to characterize the act of unemployment, the court asked what motivated the claimants not to go to work. Here, the majority changes this subjective intent test as applied in *Lanyon* and asks what motivated the plaintiffs to remain at work. I do not believe *Lanyon* is author-

ity for asking why employees choose to remain at work, nor is such an inquiry relevant under our Unemployment Compensation Act as long as employees do choose to remain at work.

Moreover, the *Lanyon* case was not concerned with the question whether the claimants there fell within the disqualification clause, for it was conceded that they did. The issue there was whether the claimants came within that provision of the statute which, if certain requirements are met, exempts from disqualification claimants who would otherwise be ineligible. One such requirement is that the claimant must satisfy the administrator that he was not a participant in the dispute. Here, we are concerned with the disqualification clause of the statute, and not the exemption clause. While intent might be relevant in determining whether a claimant was a participant, it is not relevant in determining whether his unemployment was due to the existence of a labor dispute at the factory at which he had been employed. As the plaintiffs here, unlike those in *Lanyon,* did not raise the issue of their participation in a labor dispute in the administrative proceedings or the trial court, it seems neither proper nor relevant for this court to address the issue of either participation or intent.

An unemployment commissioner is an administrative officer. An appeal from his decision to the Superior Court is allowed by statute, but the court does not try the matter de novo. *Lanyon* v. *Administrator,* supra, 28. It is not the court's function to adjudicate questions of fact; *New Haven Metal & Heating Supply Co.* v. *Danaher,* 128 Conn. 213, 217, 21 A.2d 383; nor may the court substitute its own conclusions for those of the commissioner. *Almada* v. *Administrator,* 137 Conn. 380, 391, 77 A.2d 765.

It may go no further than to determine whether the commissioner acted unreasonably, arbitrarily or illegally. *Hoffman* v. *Kelly,* 138 Conn. 614, 617, 88 A.2d 382; *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, 181, 15 A.2d 17.

Since both the commissioner and the trial court found that the struck plants in Michigan and Indiana caused the shortages and the layoffs of the plaintiffs in Bristol, this court cannot find on review, or substitute its own conclusion, that the unemployment of the plaintiffs was caused by any controversy at Bristol. Such a holding is inconsistent with the decision of *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 55 A.2d 732, where a similar situation was presented.