963 A.2d 289

LOURDES MEDICAL CENTER OF BURLINGTON COUNTY, RESPONDENT–RESPONDENT AND CROSS–APPELLANT, v. BOARD OF REVIEW, RESPONDENT–APPELLANT AND CROSS–RESPONDENT, AND DIANE PRESTWOOD, SANDRA C. VODA, JEANNE RICHARDSON, BETH A. BENN, LIESA P. MILLINGTON, BARBARA J. MARTIN, PATRICIA A. SOZIO, EDNA E. MORRISSEY, BERNICE AMARH, DEBORAH L. SORRENTINO, KARON R. BRANCH, NANCY ZIRPIOLI, CYNTHIA L. BORGSTROM, QUETTELY G. DANASTOR, DONNA TAYLOR RIVERA, VIRGINIA L. BROWN, ANNETTE M. RIDGE, JUANITA BUSSIE, CANDACE L. WEBB, JUANITA PAYNE, CHRISTINE M. GALLAGHER, JANE E. MAHER, MARIA MIRAGLIA, PAULA M. CLARK, PEGGY A. GLASPEY, DOROTHEA D. CURTIS THOMAS, KATHLEEN C. NASTO, REGINA M. JONES, THOMAS W. BRAY, KITTY L. STOUT, DZIGBORDI A. AHIEKPOR, LINDA L. PINE, FLORENCIA A. BAKER, ROVENUS D. LITTLE, MARCI J. LYONS, PATRICIA L. BOZZI, MARYANN K. LAVERTY, NANCY KELLY, PHYLLIS M. SNOW, KATHLEEN M. MORAN, ROBERT A. WALSH, BRENDA MORRISON, MARY MAIETTA, PATRICIA A. RALPH, JOSEPHINE M. FOLZ, JOSEPH R. PARKER, KIMBERLIN J. SANSONI, PATRICIA A. MARTINO, ANNA CLARK, CAROLYN D. STEVENSON, DORIS

E. ROBERTS, ANNA V. SIA, AYISHA BRYANT, MARY E. MUR-
RAY, ROSA E. JONES, LOIS J. PRICE, CHRISTINE M. MUEL-
LER, DEBBIE A. STEWART, MARY A. BEAUDET, SHARON M.
SHEDAKER, BETH A. SLIMM, SHIRLEY J. MEGARGEE,
ELEANOR A. NEUENFELDT, MILDRED E. PERRY, TERESA
E. LAVERTY, CAROLYN M. RICHMAN, CAROL A. ANDERSON,
SUSAN L. GARBE, SHIRLEY D. RICHARDSON, PURIFICA-
CION C. ST. GEORGE, YSABEL L. GALICK, ANNETTE L. ZE-
LAUSKAS, RUTH BEST, THERESA A. SCHIERS, MARY F.
HANSEN, CAROL A. KINKADE, NEDINA C. JORDEN, ELIZA-
BETH HALL, VALARIE L. STANLEY, SANDRA L. IWANICKI,
MARGARET J. CLIVER, STEPHANIE J. SAMAR, STEPHANIE
L. SMITH, JACQUELINE R. KIRBY, NORA DUNN, BARBARA
V. JONES, REGINA HASS, MARIANNE NEWMAN, LINDA L.
MAKRIS, PATRICIA A. MELCHIORRE, JOAN R. MCDOWELL,
PATRICIA L. MCQUARRIE, LISA A. HALL, SUSAN STARK,
SANDRALEE HEINZE, DEBORAH L. GOSS AND KATHLEEN
DENTON, CLAIMANTS–RESPONDENTS AND CROSS–RE-
SPONDENTS.

Argued September 9, 2008—Decided January 27, 2009.

344

*Todd A. Wigder*, Deputy Attorney General, argued the cause for appellant and cross-respondent (*Anne Milgram*, Attorney General of New Jersey, attorney; *Lewis A. Scheindlin*, Assistant Attorney General, of counsel; *Mr. Scheindlin* and *Ellen A. Reichart*, Deputy Attorney General, on the briefs).

*Thomas A. Linthorst* argued the cause for respondent and cross-appellant (*Morgan, Lewis & Bockius*, attorneys).

*Raymond G. Heineman, Jr.*, argued the cause for respondents and cross-respondents (*Kroll Heineman Giblin*, attorneys).

*Robert M. Pettigrew* argued the cause for amicus curiae New Jersey Hospital Association (*Jackson Lewis*, attorneys; *Richard W. Schey* and *David G. Islinger*, of counsel).

Justice ALBIN delivered the opinion of the Court.

In this appeal, we must determine whether nurses, while on strike against Lourdes Medical Center of Burlington County (Lourdes), were entitled to unemployment benefits. *N.J.S.A.*

43:21–5 provides that striking workers are entitled to unemployment benefits, except when the strike causes a "stoppage of work" at their place of employment. The question is what constitutes a "stoppage of work" for purposes of *N.J.S.A.* 43:21–5(d).

Despite the considerable financial difficulties produced by the strike, Lourdes continued to function at full service. It found replacement nurses, maintained its patient and employee census, and did not curtail its hospital procedures. On that basis, the Board of Review (Board) concluded that Lourdes did not suffer a "stoppage of work" within the intendment of the statute and granted unemployment benefits to the striking nurses. The Appellate Division reversed because the Board did not consider, in determining whether a work stoppage occurred, "the financial expense to which the hospital was put to maintain normal levels of service to the community." *Lourdes Med. Ctr. v. Bd. of Review*, 394 *N.J.Super.* 446, 467, 927 *A.*2d 164 (App.Div.2007).

■ We now hold that the Appellate Division erred in not deferring to the findings of the Board. We also conclude that loss of revenue attributable to the strike, which does not result in a substantial curtailment of work at the hospital, is not the equivalent of a "stoppage of work." Accordingly, we reverse the Appellate Division and reinstate the Board's decision to grant the striking nurses unemployment benefits.

## I.

### A.

Lourdes Medical Center is a 259–bed, nonprofit hospital located in Willingboro, New Jersey, employing 2000 people and providing a wide range of medical services to the public. On April 19, 2004, approximately 240 registered nurses, who had been working without a contract for almost two months, went on strike over work scheduling and economic issues.

While the labor dispute was ongoing, ninety-seven of the striking nurses filed for unemployment benefits for the period they

were out of work. On June 15, 2004, a Deputy Director of the New Jersey Division of Unemployment Insurance found the striking nurses eligible for benefits. Lourdes appealed, claiming that the nurses should have been denied benefits because they were "participating in a labor dispute."

At a hearing conducted by an appeals examiner (also known as the Appeal Tribunal), evidence was presented that the nurses, who were members of a union,[1] manned picket lines at the hospital's five entrances during the strike.[2] In response to the strike, the hospital at first hired replacement nurses, which increased by about $1 million per month the total cost for nursing staff. Later, Lourdes hired new nurses on a permanent basis. Management costs generally increased during the strike. For example, the hospital had to hire additional security guards and its public relations personnel were diverted from handling usual matters to focus full-time energies on strike-related activities. Additionally, the receipt of a $750,000 obstetrics department grant and the opening of a new laboratory were temporarily delayed. Before the strike, operational losses for the hospital were $600,000 per month, and afterward losses rose to between $1.4 and $1.75 million per month. In 2004, the hospital's losses were projected to exceed those of 2003 by $8 million.

Despite the strike, the hospital remained in full operation. The hospital's patient census remained stable, its hours of operation did not change, it did not curtail medical procedures in any department, and it found no need to discharge staff. Indeed, in a series of published letters issued during the strike, Lourdes repeatedly assured the community that there was no decline in the

---

[1] The striking nurses were members of the Jersey Nurses Economic Security Organization (JNESO) District Council 1 labor union.

[2] Lourdes presented the testimony of five witnesses: the hospital's administrator, its human resources director, and its finance director, as well as the public relations director and the corporate director for purchase and retention of Lourdes Health System.

quality of services offered by the hospital. Several weeks into the strike, Lourdes reported that doctors serving on the Medical Executive Committee viewed "nursing care at the hospital [as] 'excellent' and patient care '[as having] never been better.'" In the fifth week of the strike, Lourdes was "pleased to report that hospital operations continue to run smoothly." In a letter to registered nurses, approximately nine weeks after the inception of the labor dispute, Lourdes insisted that the "hospital has been able to maintain operations and continue to provide quality care to the community." Despite the sunny face it portrayed in those letters, Lourdes claimed at the Appeal Tribunal hearing that the strike required a public relations offensive to counteract rumors that it might close.

At the hearing, Lourdes emphasized that because a hospital is highly regulated by the state, it could not simply close its doors due to mounting financial losses without first engaging in a lengthy and complex legal process to obtain the issuance of a certificate of need from the Commissioner of Health and Senior Services. Lourdes argued that it should not be forced to "subsidize" a strike that was placing it in "severe financial distress."

To determine whether the hospital suffered a "stoppage of work" under *N.J.S.A.* 43:21–5(d) and *N.J.A.C.* 12:17–12.2(a)(2), the appeals examiner looked to the governing statute and regulation. *N.J.S.A.* 43:21–5(d) provides that an individual is disqualified from receiving unemployment benefits if her "unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises" where she was employed. *N.J.A.C.* 12:17–12.2(a)(2) defines "'[s]toppage of work' [as] a substantial curtailment of work which is due to a labor dispute." That regulation also provides that "[a]n employer is considered to have a substantial curtailment of work if not more than 80 percent of the normal production of goods or services is met."[3] *Ibid.*

---

[3] *N.J.A.C.* 12:17–12.2(a)(1) defines "'[l]abor dispute' [as] any controversy concerning wages, hours, working conditions or terms of employment between an

With those legal principles in mind, the appeals examiner noted that, during the strike, the hospital "operate[d] at normal occupancy levels" without a decrease in the census of patients, "did not reduce the medical procedures or services provided to the public," and "maintain[ed] all of the same quality services to the public." The appeals examiner took into account that Lourdes incurred a cost of $1 million per month to replace the striking registered nurses with agency nurses and "hired approximately 40 new nurses." One-third of the striking nurses had returned to work by the date of the hearing.

Despite the "great cost" to the hospital caused by the strike, the appeals examiner concluded that there was not a "stoppage of work" as defined by *N.J.A.C.* 12:17–12.2(a)(2) or *N.J.S.A.* 43:21–5(d). The examiner rejected Lourdes' argument that the regulation "should not apply to a hospital's production." Therefore, the examiner held that the striking nurses were entitled to unemployment benefits.

The Board of Review affirmed the decision of the appeals examiner.

## B.

The Appellate Division reversed the Board of Review and remanded to the Board for consideration of "whether the financial expense to which the hospital was put to maintain normal levels of service to the community, including its net revenue, constitutes a stoppage of work within the meaning and intendment of the statute and regulation here at issue." *Lourdes Med. Ctr., supra,* 394 *N.J.Super.* at 467, 927 *A.*2d 164. In reaching that decision, the appellate panel nevertheless upheld the validity of *N.J.A.C.* 12:17–12.2(a)(2), finding that the application of the regulation's "eighty-percent rule" to a hospital was consistent with the "statutory scheme and the public policy supporting it" and therefore was

---

employer and a bargaining unit or a group of employees." No one disputes that this case involves a labor dispute.

neither arbitrary nor capricious. *Id.* at 461–62, 927 *A.*2d 164. Significant to the panel's determination was that the hospital, as a regulated entity, had no choice but to hire replacement nurses and remain in full operation, given that a shutdown could take as long as a year. *Id.* at 467, 927 *A.*2d 164.

The panel compared the present case to the unreported Appellate Division opinion in *Dominicus v. Board of Review (Amergen )*, No. A–3352–04T2, 2007 *WL* 92415 (App.Div. Jan. 2, 2007). *Amergen* involved a ten-week union strike at the American Energy Company, a nuclear-powered electric-generating facility where 219 of 439 workers withheld their services. *Lourdes Med. Ctr., supra,* 394 *N.J.Super.* at 456, 464–67, 927 *A.*2d 164. In *Amergen,* in measuring what constituted " 'normal production of goods and services,' " the Board of Review's focus was not solely on whether the nuclear power plant generated electricity at full capacity. *Id.* at 465, 927 *A.*2d 164. Rather, in considering whether a "stoppage of work" occurred during the strike, the Board noted that "the workforce was only able to complete fifty to sixty percent of the work normally done" and that "projects were reduced, postponed or left undone during the strike." *Id.* at 464–65, 927 *A.*2d 164. Based on those facts, the Board concluded that the power plant had experienced "a substantial curtailment of work" and therefore a work stoppage. *Id.* at 465, 927 *A.*2d 164.

In drawing a parallel to *Amergen,* the appellate panel found that although Lourdes remained in full operation during the strike, its "routine work processes and projects were reduced, postponed or left undone" and it incurred "significant financial deficits directly attributable to the cost of securing replacement nurses." *Id.* at 466, 927 *A.*2d 164.

Relying, in part, on case law in other jurisdictions, the panel was "persuaded that revenue is a factor that must be considered in determining whether there was a stoppage of work as a result of a labor dispute." *Id.* at 467, 927 *A.*2d 164. Because "there was no statistical analysis provided analyzing the effect of [the hospital's] reductions and establishing that the net revenue was reduced

by twenty percent or more," *id.* at 466–67, 927 *A.*2d 164, the matter was remanded to the Board for further review, *id.* at 467, 927 *A.*2d 164.

We granted the Board of Review's petition and Lourdes' cross-petition for certification. 193 *N.J.* 222–23, 936 *A.*2d 969 (2007). We also granted the New Jersey Hospital Association's motion to participate as amicus curiae.

## II.

The Board of Review argues that the Appellate Division, by substituting its own policy judgments for the Board's findings of fact and law, violated the deferential standard of review that is owed to the agency responsible for administering the statutes and regulations governing the unemployment compensation system. The Board contends that striking workers are statutorily guaranteed unemployment benefits unless the labor dispute causes the employer to suffer a "substantial curtailment of work," *N.J.A.C.* 12:17–12.2(a)(2). That test, according to the Board, encompasses a consideration of "the impact of the labor dispute on the employer's overall work processes." Applying its agency expertise to that test, the Board concluded that Lourdes did not suffer a "stoppage of work."

The Board points out that a strike intended to redress workers' grievances, by its very nature, will necessarily "cause financial harm to the employer." By making "financial impact the primary determinant of the existence of a work stoppage," the Appellate Division's decision will effectively strip striking workers of unemployment benefits in most cases—even when the business remains in full operation—and force the unemployment agency "to engage in complex, time-consuming inquiries into the employer's financial status." In the Board's judgment, "the stoppage of work test" is "clearly directed at the employer's operations, not the financial harm suffered by the employer," and therefore "financial impact should not be a material factor" in that test.

The striking nurses join in the arguments advanced by the Board, adding that Lourdes made a strategic business decision not to curtail its patient care operations in order to defend its "market share" against four competing area hospitals. By maintaining its normal operations and engaging in an "aggressive advertising campaign," Lourdes ensured not only "the continued flow of government funding," but also that the hospital would remain a going concern. Additionally, the nurses emphasize that although the State may have temporarily postponed a $750,000 grant to the obstetrics department, the government bankrolled the hospital through the "unimpeded flow of Medicare and Medicaid funding." Loss of growth opportunities and even loss of revenue, according to the nurses, do not constitute "a stoppage of work" under the applicable statute and regulation.

Lourdes responds with a two-fold argument. First, it argues that the Appellate Division correctly ruled that the Board misapplied its own work processes test devised in *Amergen.* Lourdes submits that under the flexible work processes test a "stoppage of work" occurred at the hospital. The hospital satisfied that test, it insists, because the entire nursing staff walked off the job and "routine work processes and projects were reduced, postponed, or left undone during the strike." Lourdes maintains that the Board should not have looked narrowly at patient census—the production of goods or rendering of services—as the sole measure of determining whether a work stoppage occurred. Because a hospital is responsible for delivering uninterrupted, quality healthcare, the Board should have analyzed lost revenue and profitability under the work processes test in assessing whether the striking nurses caused a work stoppage.

Second, it contends that the Appellate Division erred in not invalidating *N.J.A.C.* 12:17–12.2(a)(2), which provides that "[a]n employer is considered to have a substantial curtailment of work if not more than 80 percent of the normal production of goods or services is met." Lourdes maintains that the regulation is an arbitrary guideline inconsistent with its enabling statute.

Lourdes states that the regulation does not account for the impact of a strike on the normal operations of a hospital, which cannot simply close its doors. It disagrees that financial inquiries into the economic livelihood of the business will be complex and time-consuming, and also complains that the regulation "has the effect of arbitrarily requiring a hospital to fund a strike against it[self]," thus violating the public policy of "State neutrality in labor disputes."

Amicus Curiae New Jersey Hospital Association echoes the positions articulated by Lourdes. The Association believes that the Appellate Division correctly considered net revenue to be "one important factor" in analyzing whether there was a substantial curtailment of work under the work processes test. The Association also considered the "eighty percent rule" embodied in *N.J.A.C.* 12:17–12.2(a)(2) to be an arbitrary and capricious formula that "precludes a holistic review of the impact of a strike on an employer's normal overall operations." According to the Association, "[t]he Board was required to analyze the disruption caused by the reassignment of [the] Hospital's staff and the costs of hiring temporary workers."

### III.

In deciding between the competing claims, we must determine whether the Board of Review properly exercised its authority in granting unemployment benefits to the striking workers. That undertaking requires that we first construe *N.J.S.A.* 43:21–5(d), which allows striking workers to receive unemployment benefits, provided they do not cause their employer to suffer a "stoppage of work."

We begin by reviewing the statutory language in dispute. *N.J.S.A.* 43:21–5 states that

[a]n individual shall be disqualified for benefits:

[ ... ]

(d) If it is found that this unemployment is due to *a stoppage of work* which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed.

[*N.J.S.A.* 43:21-5 (emphasis added).]

It has been long accepted that the term "stoppage of work" refers to whether the nurses caused work to stop at the hospital ("factory, establishment or other premises") and not whether the striking nurses stopped working themselves. *See Gerber v. Bd. of Review*, 36 *N.J.Super.* 322, 328, 115 *A.2d* 575 (App.Div.), *aff'd*, 20 *N.J.* 561, 120 *A.2d* 436 (1956); *see also* Herbert Fierst & Marjorie Spector, *Unemployment Compensation in Labor Disputes*, 49 *Yale L.J.* 461, 483 (1940) ("The technical meaning of the term 'stoppage of work,' as used in disqualification clauses, is a substantial curtailment of work in an establishment, not the cessation of work by the claimant or claimants."). In other words, striking employees are not disqualified from receiving benefits because they refused to appear for work because of a labor dispute; they are disqualified from receiving benefits only if they cause a "stoppage of work" at their place of employment. *Gerber, supra*, 36 *N.J.Super.* at 328, 115 *A.2d* 575.[4]

In considering whether the striking nurses at Lourdes caused a "stoppage of work," disqualifying them from unemployment benefits, we first must determine what the Legislature intended by using the term "stoppage of work." *DiProspero v.*

---

[4] We also note that the overwhelming consensus among the various jurisdictions is that "stoppage of work" refers to the status of the employer's business, not the status of the worker's employment. *See, e.g., Crescent Chevrolet v. IDJS*, 429 *N.W.2d* 148 (Iowa 1988) (holding that stoppage of work refers to curtailment of employer's operations, not claimants' absence from work); *Lawrence Baking Co. v. Unemployment Comp. Comm'n*, 308 *Mich.* 198, 13 *N.W.2d* 260, 264 (1944) ("The phrase 'stoppage of work' refers to the work and operations of the employer establishment and not to the work of the individual employee."); *Magner v. Kinney*, 141 *Neb.* 122, 2 *N.W.2d* 689, 692 (1942) ("[T]he technical meaning of the term, 'stoppage of work,' as used in our disqualification clause, is a substantial curtailment of work in an establishment, not the cessation of work by the claimant or claimants."); *see also In re Steelman*, 219 *N.C.* 306, 13 *S.E.2d* 544 (1941). *But see Bd. of Review v. Mid-Continent Petroleum Corp.*, 193 *Okla.* 36, 141 *P.2d* 69 (1943).

*Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) ("The Legislature's intent is the paramount goal when interpreting a statute . . . ."). The unemployment compensation law nowhere defines the phrase "stoppage of work." One dictionary definition of the word "stoppage" is an "act or instance of stopping; cessation of activity: the stopping of all work at the factory," *Webster's Unabridged Dictionary of the English Language* 1876 (2001). Although typically, "[w]e ascribe to the statutory words their ordinary meaning and significance," *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 (citations omitted), we recognize that "stoppage of work" is a term of art used by the statute's drafters. We do not have access to committee reports and sponsor statements that might shed light on the meaning of those words. *See DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039. Indeed, "[t]he original bill" that served as the basis for the passage of the unemployment law is not even available at the New Jersey State library.[5] N.J. State Library, *Legislative History Checklist for N.J.S.A. 43:21–5a* 1 (1957).

We know, however, that our state's unemployment law is nearly identical in language to laws passed in every jurisdiction in the country in the period between 1932 and 1939, as part of the national response to the Great Depression. New Jersey's statute, like that of other jurisdictions, was modeled after the federal Social Security Draft Bill. *See* Fierst & Spector, *supra,* at 491. The federal Bill's so-called "stoppage of work" clause was copied from a similarly-worded provision in the British Unemployment Insurance Act of 1911. *See* 1 & 2 *Geo. V, c.* 55, §§ 84–87(g)(1); *see also* K. Pribham, *Compensation for Unemployment During Industrial Disputes,* 51 *Monthly Lab. Rev.* 1375, 1380 (1940) (noting that Draft Bill "[f]ollow[s] the example set by the British Unemployment Insurance Act").

---

[5] "It is quite probable" that the "bill" did not contain a sponsor "statement." An earlier bill, S. 215, introduced during the regular session of 1936 and which is substantially the same bill, does not have a statement either. N.J. State Library, *Legislative History Checklist for N.J.S.A. 43:21–5a* 1 (1957).

In the years after passage of New Jersey's unemployment law, our courts and the Department of Labor's Board of Review rejected a literal interpretation of the term "stoppage of work." In *Ablondi v. Board of Review*, 8 *N.J.Super.* 71, 73 *A*.2d 262 (App.Div.1950), Judge (later Justice) Jacobs noted that although " 'stoppage of work' refers generally to a cessation of plant operations ... [i]t has been recognized ... that the stoppage need not be complete and that it will suffice if there has been a substantial curtailment of operations." *Id.* at 76–77, 73 *A*.2d 262 (citations omitted). In *Ablondi*, the Appellate Division affirmed the finding of the Board of Review that a "substantial curtailment in production at the employer's [fur] plant" occurred when normal production of furs had diminished by ninety percent. *Id.* at 78, 73 *A*.2d 262; *see also Gerber*, *supra*, 36 *N.J.Super.*, at 328, 115 A.2d 575 (noting that "labor dispute result[ed] in a stoppage of work" because all production workers became unemployed as result of strike). In affirming *Gerber*, this Court generally accepted, as its premise, the reasoning of *Ablondi*. *See Gerber*, *supra*, 20 *N.J.* at 566–67, 120 *A*.2d 436 (citing *Ablondi*, *supra*, 8 *N.J.Super.* 71, 73 *A*.2d 262).

Those states that continue to adhere to the work-stoppage rule, similar to *N.J.S.A.* 43:21–5(d), almost uniformly take the approach that a substantial curtailment of the operations of a plant or factory due to a labor dispute qualifies as a "stoppage of work." *See* Fierst & Spector, *supra*, at 483 ("The technical meaning of the term 'stoppage of work,' as used in disqualification clauses, is a substantial curtailment of work in an establishment...."); Milton I. Shadur, *Unemployment Benefits and the Labor Dispute Qualification*, 17 *U. Chi. L.Rev.* 294, 310 (1949–1950) ("There has consequently been unanimous acceptance ... in this country, of the proposition that a *substantial* curtailment is sufficient to disqualify claimants."); Willard A. Lewis, *The "Stopping of Work" Concept in Labor Dispute Disqualification Jurisprudence*, 45 *J. Urb. L.* 319, 327 & n. 30 (1967) (noting there is "universal acceptance" of proposition that " 'stoppage of work'

means a substantial cessation or curtailment of the normal operations or production of the employer"); *see also Ablondi, supra,* 8 *N.J.Super.* at 76–77, 73 *A.*2d 262 (citing *Midvale Co. v. Unemployment Compensation Bd. of Review,* 165 *Pa.Super.* 359, 67 *A.*2d 380 (1949); *Magner v. Kinney,* 141 *Neb.* 122, 2 *N.W.*2d 689 (1942)); *Totorica v. Western Equip. Co.,* 88 *Idaho* 534, 401 *P.*2d 817, 822 (1965) ("A work stoppage is deemed to have ended when the employer resumed substantially normal operations." (citation omitted)); *In re Stevenson,* 237 *N.C.* 528, 75 *S.E.*2d 520, 524 (1953) ("[A] stoppage of work commences at the plant of the employer when a definite check in production operations occurs, and a stoppage of work ceases when operations are resumed on a normal basis." (citation and internal quotation marks omitted)).

In some of the earliest decisions of New Jersey's Board of Review, a stoppage of work was found when there was a twenty-percent decrease in production, *N.J. Bd. Rev.* BR–65L (1939), and not found when production did not decrease more than fifteen percent, *N.J. Bd. Rev.* BR–91L (1939). Consistent with the approach taken both in our case law and by the Board, the New Jersey Department of Labor promulgated a regulation stating that a " '[s]toppage of work' means a substantial curtailment of work which is due to a labor dispute." *N.J.A.C.* 12:17–12.2(a)(2). That regulation further refined the test by stating that, "[a]n employer is considered to have a substantial curtailment of work if not more than 80 percent of the normal production of goods or services is met." *Ibid.*

IV.

A.

Although this State has held fast to the work-stoppage rule for more than seventy years, other states have taken different approaches. For example, California now denies benefits to striking

workers under all circumstances.[6]   On the other hand, New York expanded unemployment benefits to striking workers, allowing the payment of benefits even if a plant or factory is forced to shut down due to a labor dispute.[7]   As of 1988, New Jersey was one of twenty-four states that maintained a work-stoppage rule.   *See* Robert Hutchens et al., *Unemployment Insurance and Strikes,* 4 *J. Lab. Res.* 337, 339 (1992).

After 1950, when Justice Jacobs in *Ablondi, supra,* construed *N.J.S.A.* 43:21–5(d) as granting unemployment benefits to strikers, provided they did not substantially curtail the work of their employer, "several attempts" were made by New Jersey's Legislature to amend *N.J.S.A.* 43:21–5(d)—"all of them unsuccessful." *Gerber, supra,* 36 *N.J.Super.* at 331, 115 *A.2d* 575.   The failed legislative initiatives to amend the work-stoppage rule, *N.J.S.A.* 43:21–5(d), reflected business's effort to limit the availability of striker benefits and labor's effort to expand those benefits.[8]

---

[6] *See, e.g., Cal. Unemp. Ins.Code* § 1262 (West 2008) ("An individual is not eligible for unemployment compensation benefits, and these benefits shall not be payable to him or her, if the individual left his or her work because of a trade dispute.   The individual shall remain ineligible for the period during which he or she continues out of work by reason of the fact that the trade dispute is still in active progress in the establishment in which he or she was employed.").

[7] *See* Robert Hutchens et al., *Unemployment Insurance and Strikes,* 4 *J. Lab. Res.* 337, 339–40 (1992) (noting, as of 1992, that "[s]trikers in New York and Rhode Island can obtain UI benefits after a waiting period of eight weeks in New York and seven weeks in Rhode Island"); *see also N.Y. Labor Law* § 592 (McKinney 2008) ("Industrial controversy.   The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks ... after such claimant lost his or her employment because of a strike....").

[8] *Compare, e.g.,* Assem. B. 166, 175th Sess. (N.J. 1951) (proposing that when there is no work stoppage, striker's benefits should be limited to four weeks), *and Hearing on S.B. 400 Before the Assem. Labor and Industrial Relations Comm.,* 191st Sess. 34 (N.J. 1967) (statement of James R. Tobin, N.J. Manufacturers Association) ("There is little justice or moral principle in providing strike benefits or special privileges to one segment of the labor force ...."), *with* S.B. 269, 177th Sess. (N.J. 1953) (proposing to expand benefit availability by eliminating disqualification for "lockouts"), *and Strike Benefits May Shunt Jobless Bill to Side Track, Trenton Times,* June 5, 1966 (noting that State AFL–CIO conven-

In 1967, the labor movement achieved a short-lived legislative victory with the adoption of the "strike benefits clause." Like the statute in New York, that clause allowed for the payment of unemployment benefits—after a forty-two day waiting period—*even if a business was closed due to a labor dispute.* *L.* 1967, *c.* 30, § 3.[9] In response to strong, publicly voiced opposition, the "strike benefits clause" was repealed thirty days after its effective date. *See L.* 1968, *c.* 1, § 1.[10] The Legislature readopted the original language of *N.J.S.A.* 43:21-5(d), thus reinstating the work-stoppage rule as it existed before enactment of the "strike benefits clause." [11] *See* 1A Norman J. Singer, *Sutherland Statutory Construction* § 23:30 (6th ed. 2000) ("The reenactment of a statute is a continuation of the law as it existed prior to the reenactment as far as the original provisions are repeated without change in the reenactment."). Our courts and the Board of Review continue to recognize the work-stoppage rule no differently than before the thirty-day reign of the "strike benefits clause."

---

tion "unanimously adopted a resolution calling for passage of ... [a] strike clause" which did not factor work stoppages).

[9] Following the forty-two day period, the statute authorized payments to the striking workers from the Unemployment Trust Fund, provided that the workers did not "refuse[ ] to voluntarily arbitrate the dispute or ... refuse[ ] the services of a mediation agency." *L.* 1967, *c.* 30, § 3.

[10] Apparently, the strike benefits clause became an issue in the 1967 state elections. On signing the repeal of the strike benefits clause, Governor Hughes stated: "[T]he people by their vote indicated in unmistakable terms their belief and desire that individuals on strike—even with the safeguards provided by the Act—should not be paid unemployment compensation." Press Release, Office of the Governor, Statement by Governor Richard J. Hughes on Signing of Senate Bill 2 (Jan. 31, 1968) (on file with the New Jersey State library) [hereinafter Press Release].

[11] *Compare L.* 1961, *c.* 43 ("For any week with respect to which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed ...."), *with L.* 1968, *c.* 1 ("If it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed....").

*See, e.g., Lourdes Med. Ctr., supra,* 394 *N.J.Super.* at 461, 927 *A.*2d 164 ("[S]triking employees may draw upon the fund, provided the employer has not experienced a 'stoppage of work.'" (citing *Sweeney v. Bd. of Review,* 43 *N.J.* 535, 539, 206 *A.*2d 345 (1965))).

### B.

In concluding that the very act of going out on strike is a work stoppage, thus making striking workers always ineligible for unemployment benefits, our dissenting colleague ignores this state's case law, Board of Review decisions, and the overwhelming weight of authority in this country construing provisions similar to *N.J.S.A.* 43:21–5(d). That misinterpretation of *N.J.S.A.* 43:21–5(d) rests almost entirely on a misreading of a 1968 press release issued by Governor Hughes on the occasion of the repeal of the "strike benefits clause." In the press release, the Governor stated that the purpose of the repeal was intended "to remove the provision permitting the payment of benefits to those on strike after a work stoppage has continued for more than six weeks, subject to certain safeguards." Press Release, *supra,* at 1. Governor Hughes's words directly addressed the repeal of the "strike benefits clause," and nothing else. Contrary to the suggestion of the dissent, Governor Hughes's signing statement in no way indicated that the courts had incorrectly interpreted the work-stoppage rule, which was reinstated on repeal of the "strike benefits clause."

The reality—to which the dissent turns a blind eye—is that in the forty years after 1968 and the thirty years before that date, striking workers have received unemployment benefits when they have not caused a work stoppage at their place of employment. Tellingly, our dissenting colleague's interpretation of *N.J.S.A.* 43:21–5(d) is so at odds with labor and management's understanding of what that statute means that not even Lourdes advanced the argument that he now makes. Ultimately, our dissenting colleague would substitute his own policy choices for those made by our Legislature in 1936.

## V.

We next turn to Lourdes' contention that under *N.J.S.A.* 43:21–5(d) the Board of Review improperly found that there was no substantial curtailment of services at the hospital during the strike. Lourdes also argues that the "eighty percent rule" enunciated in *N.J.A.C.* 12:17–12.2(a) is not authorized by *N.J.S.A.* 43:21–5(d) and therefore is ultra vires, at least as applied to this case. In raising those arguments, Lourdes presents a broad-based policy complaint that, by providing unemployment benefits to striking workers, it has been made to subsidize the strike in violation of state law.

## A.

In reviewing the decision of a state agency, charged with enforcing the laws and regulations governing the disbursement of unemployment benefits, this Court's appellate authority is limited to determining whether the agency acted arbitrarily, capriciously, or unreasonably. *Brady v. Bd. of Review,* 152 *N.J.* 197, 210, 704 *A.*2d 547 (1997); *Pub. Serv. Elec. v. N.J. Dep't of Envtl. Protec.,* 101 *N.J.* 95, 103, 501 *A.*2d 125 (1985). We look at four factors in assessing whether an agency acted within the scope of its authority:

(1) whether the agency's decision offends the State or Federal Constitution;

(2) whether the agency's action violates express or implied legislative policies;

(3) whether the record contains substantial evidence to support the findings on which the agency based its action; and

(4) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant facts.

[*Brady, supra,* 152 *N.J.* at 211, 704 *A.*2d 547 (quoting *George Harms Constr. v. Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.*2d 76 (1994)).]

Only factors two and four are at issue here. Lourdes urges that, in relying on *N.J.A.C.* 12:17–12.2(a), the Board's decision violates express or implied legislative policies of *N.J.S.A.* 43:21–5(d). Lourdes also contends that, when applying the legislative policy

expressed in *N.J.S.A.* 43:21–5(d), the Board's finding is not supported by sufficient credible evidence in the record.

Ordinarily, this Court " 'give[s] substantial deference' " to the agency's interpretation of the statute it is charged with enforcing. *In re Application of Virtua–West Jersey Hosp. Voorhees,* 194 *N.J.* 413, 422, 945 *A.*2d 692 (2008) (quoting *Saint Peter's Univ. Hosp. v. Lacy,* 185 *N.J.* 1, 15, 878 *A.*2d 829 (2005)). Even though we are not " 'bound by the agency's interpretation of a statute or its determination of a strictly legal issue,' " we give considerable latitude when it construes the "express and implied powers" of a statute for the purpose of carrying out legislative intent. *Ibid.* (citations omitted).

## B.

In deciding whether the Board properly construed and applied *N.J.S.A.* 43:21–5(d), we start with an overview of the Legislature's purpose in enacting New Jersey's unemployment compensation law, *N.J.S.A.* 43:21–1 et seq. As mentioned earlier, the unemployment compensation law came into being in the depths of the Great Depression of the 1930s. In the statute's opening declarations, the Legislature expressed that "economic insecurity due to unemployment [was] a serious menace to the health, morals, and welfare of the people of this state." *N.J.S.A.* 43:21–2. To meet the desperate needs of New Jersey's citizens, the Legislature created a social safety net—a means of financial assistance—for the unemployed worker and his family who suffered the "crushing force" of economic dislocation. *Ibid.* The new law accomplished that end by requiring employers to accumulate "unemployment reserves to be used for the benefit of persons unemployed after qualifying periods of employment." *Ibid.*[12] Although the unemployment compensation law generally addresses "the serious social

---

[12] Both employers and employees contribute to the Unemployment Trust Fund, which finances the benefits paid to unemployed workers, including those striking workers involved in a labor dispute. *See N.J.S.A.* 43:21–7.

consequences" of those who suffer "involuntary unemployment," *ibid.*, the Legislature specifically included unemployment benefits for striking workers, provided that they do not cause "a stoppage of work" at the place of their employment, *N.J.S.A.* 43:21–5(d).

New Jersey's unemployment compensation law was passed at a turbulent time in the history of labor relations when unions and management were locked in battle over issues ranging from employee demands for sustainable wages to improved working conditions.[13] *N.J.S.A.* 43:21–5(d), which grants unemployment benefits to striking workers, allows ordinary men and women, who otherwise could not afford to leave work to protest for increased wages or decent working conditions, the lifeline of unemployment benefits. The statute simply permits labor to compete on a more equal playing field with management. However, the statute also recognized that striking workers could not expect to receive unemployment compensation if they shut down or put out of business, or substantially curtailed the operations of the very employer paying "unemployment reserves to be used for [their] benefit." *See N.J.S.A.* 43:21–2; *Sweeney, supra,* 43 *N.J.* at 539, 206 *A.*2d 345 (explaining that striking worker loses eligibility for benefits when employer "experience[s] the impact of inactivity on account of the labor dispute"). Thus, under the statute, striking workers who cause a work stoppage receive no benefits if they kill—or substantially curtail the operations of—the golden goose. *See* Hutchens et al., *supra,* at 339 ("In a sense this provision provides strikers with insurance against a failed strike. In work

---

[13] "[T]he 1930s represented a high-water mark for labor insurgency...." Michael Goldfield, *Worker Insurgency, Radical Organization, and New Deal Labor Legislation,* 83 *Am. Pol. Sci. Rev.* 1257, 1257 (1989). The period was marked by conflict, and sometimes violence, between labor and management. *Id.* at 1273–74. The labor unrest of the period led to the passage of national legislation, including the National Labor Relations Act, which was "[e]nacted in 1935 to promote unions and collective bargaining." Edward Silver & Joan McAvoy, *The National Labor Relations Act at the Crossroads,* 56 *Fordham L.Rev.* 181, 181 (1987). New Jersey's unemployment law providing benefits to striking workers followed in 1936. *See L.* 1936, *c.* 270.

stoppage states, if a strike succeeds in forcing employers to close down or reduce the scale of their operations significantly, the strikers cannot collect unemployment benefits. . . .").

Lourdes complains that it should not be made to subsidize a strike by contributing to the unemployment benefits of workers who walk off the job due to a labor dispute. The Legislature, however, rejected Lourdes' policy argument when it enacted *N.J.S.A.* 43:21–5(d). That statute " 'deals with a sensitive area of [labor] policy.' " *Febbi v. Bd. of Review*, 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961) (quoting *Gerber, supra*, 20 *N.J.* at 566, 120 *A.*2d 436). "[O]ur province is merely to interpret and apply [the statute] to particular situations as they are presented, keeping in mind the general policy of the act." *Ibid.* With "regard to the rightness or reasonableness of the positions or demands of the employer or the employees," the State maintains a "completely neutral position." *Ablondi, supra*, 8 *N.J.Super.* at 76, 73 *A.*2d 262; *see also N.J.A.C.* 12:17–12.2(a)(2) ("Justification for the labor dispute may not be considered.").[14]

## C.

Lourdes argues that because a hospital serves the immediate health needs of the public, is highly regulated, and cannot close down unless the Commissioner of Health and Senior Services grants permission through a certificate of need, it should not be governed by a regulation measuring output of goods and services as though it were a widget factory. But *N.J.S.A.* 43:21–

---

[14] Our jurisprudence has repeatedly noted that the legislative policy underlying the enactment of section 5(d) " 'place[s] the State in a completely neutral position without regard to the rightness or reasonableness of the position or demands of the employer or the employees.' " *Febbi v. Bd. of Review*, 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961) (quoting *Mortensen v. Bd. of Review*, 21 *N.J.* 242, 246, 121 *A.*2d 539 (1956)); *see also Sweeney v. Bd. of Review*, 43 *N.J.* 535, 539, 206 *A.*2d 345 (1965) ("The Legislature adopted an attitude of 'neutrality'. . . ."); *Westinghouse Elec. Corp. v. Bd. of Review*, 25 *N.J.* 221, 227–28, 135 *A.*2d 489 (1957). The State avoids "taking sides" in a labor dispute by not assessing the merits of the labor dispute.

5(d) includes within its compass labor disputes "at the factory, establishment or other premises" and does not exempt any profit or non-profit business or rank in terms of importance industries or professions. "We cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment.... Our duty is to construe and apply the statute as enacted." *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 (citations and internal quotation marks omitted).

Under the statute, the employees involved in a work stoppage at a steel plant making instruments for the defense industry stand in no different a position than those employees involved in a work stoppage at a local coffeehouse. Nothing in *N.J.S.A.* 43:21-5(d) suggests that the right to unemployment benefits by striking workers is diminished when those seeking increased wages or better working conditions are nurses.[15] It is well recognized that "to further [the compensation law's] remedial and beneficial purposes ... the [compensation law] is to be construed liberally in favor of allowance of benefits." *Utley v. Bd. of Review,* 194 *N.J.* 534, 543, 946 *A.*2d 1039 (2008) (citations and internal quotation marks omitted).

Significantly, Lourdes did not have to close down to qualify for a work stoppage. Although the statute requires a "stoppage of work" to disqualify striking workers from receiving unemployment benefits, our case law only requires a "substantial curtailment of work" to constitute a "stoppage of work." *N.J.A.C.* 12:17–12.2(a)(2) provides an additional gloss on the statute—a "substantial curtailment of work" occurs "if not more than 80 percent of

---

[15] Moreover, nurses, like other workers in private employment have the constitutional "right to organize and bargain collectively." *N.J. Const.* art. I, ¶ 19; *see I.B.T., Local No. 863 v. Seaboard Farms,* 214 *N.J.Super.* 425, 428, 519 *A.*2d 920 (App.Div.1986) (stating that "encompassed within their right to bargain collectively," private employees have the right to strike); *N.J. Turnpike Auth. v. Am. Fed'n of State, County, & Mun. Employees,* 83 *N.J.Super.* 389, 398, 200 *A.*2d 134 (Ch.Div.1964) ("Implicit [within the state constitution] is the right to strike, picket and employ whatever other techniques may exist to further peaceably the desires of persons in private employment.").

the normal production of goods or services is met." We are not aware of any reported New Jersey case in which a substantial curtailment of work was found when an employer's level of services or production of goods exceeded eighty percent. Even in the unreported *Amergen* decision—relied on by the Appellate Division in this case—approximately forty percent or more of the overall work in the nuclear power plant was left undone during the strike.[16]

Here, if patient census or patient services had decreased by more than twenty percent or if the hospital's operations in any of a number of ways had diminished by more than twenty percent, the Board may well have found a substantial curtailment of work under both *N.J.A.C.* 12:17–12.2(a)(2) and *N.J.S.A.* 43:21–5(d).[17] However, as a conscious business objective, the hospital may have determined to maintain full services in order not to lose its edge in a' very competitive market or to encourage the strikers' demands. Indeed, by the date of the Appeal Tribunal hearing, one third of the striking nurses had returned to work, suggesting that the strike was beginning to founder.

We cannot agree with the Appellate Division in this case that "revenue is a factor that must be considered in determining whether there was a stoppage of work as a result of a labor dispute" or that the Board erred by not discounting "the financial expense to which the hospital was put to maintain normal levels of service to the community." *Lourdes Med. Ctr., supra,* 394 *N.J.Super.* at 467, 927 *A.2d* 164. It is fair to conclude that the Legislature that enacted *N.J.S.A.* 43:21–5(d) understood that a strike would have a negative affect on the revenue of an employer

---

[16] We address the unpublished opinion in *Amergen* solely because the Appellate Division did so in rendering its decision. Nevertheless, we underscore that "[n]o unpublished opinion shall constitute precedent or be binding upon any court" and, with exceptions that are not present here, "no unpublished opinion shall be cited by any court." *R.* 1:36–3.

[17] Because the overall work processes in the hospital had not been cut back, we need not address the work processes test articulated in *Amergen*.

involved in a labor dispute. The very purpose of a strike is to inflict sufficient financial pain on an employer to accomplish the goal of the striking workers. *See, e.g., Trompler, Inc. v. NLRB,* 338 *F.*3d 747, 751 (7th Cir.2003) ("[T]he entire purpose of a strike is to exert economic pressure on the employer by withholding labor services that he needs."). The Legislature employed the words "stoppage of work" as the defining point when striking workers would lose their unemployment benefits. Loss of financial revenue is just not a work stoppage, and if lost revenue were the test under *N.J.S.A.* 43:21–5(d), there would be a work stoppage in almost every case. Had the Legislature intended a business's loss of revenue to constitute "a stoppage of work," it undoubtedly would have said so. *See DiProspero, supra,* 183 *N.J.* at 506, 874 *A.*2d 1039. We cannot interfere with the policy choices made by the Legislature. *Ibid.* If the Legislature wishes to enact a different standard for hospitals, it is free to do so.

It bears mentioning that some sister courts, when considering the issue of a stoppage of work, do not give any consideration to loss of revenue, focusing instead on practical measures of output and production. *See, e.g., Monsanto Chem. Co. v. Comm'r of Labor,* 229 *Ark.* 362, 314 *S.W.*2d 493, 496 (1958) (considering number of oil barrels produced, and not revenue, in determining whether stoppage continued to exist); *Cont'l Oil Co. v. Bd. of Labor Appeals,* 178 *Mont.* 143, 582 *P.*2d 1236, 1244 (1978) ("Clearly, in determining whether there is a stoppage of work at the plant such as appellant's which is engaged in the production of a final product or set of final products, the first and major measure must be [whether] such production is curtailed or stopped." (citations omitted)); *see also* Jerre S. Williams, *The Labor Dispute Disqualification—A Primer and Some Problems,* 8 *Vand. L.Rev.* 338, 340 (1955) ("While various factors obviously would enter in, the courts tend to concentrate on the diminution of the activities of production in determining the question of existence of a stoppage of work. The critical breaking point would seem to be about a 20 to 30 per cent cut in production as being sufficient to establish a stoppage.").

Other state courts consider revenue as only one factor along with the more traditional indicia of a work stoppage, such as decreased production and changes in operating hours. *See, e.g., Twenty–Eight (28) Members of Oil, Chem. & Atomic Workers Union v. Employment Sec. Div. of Alaska Dep't of Labor,* 659 *P.*2d 583, 591–92 (Alaska 1983) (noting that courts consider as factors "decreased production, business revenue, service, number of employees, payroll, or man-hours" (citation omitted)); *Mountain States Tel. & Tel. Co. v. Sakrison,* 71 *Ariz.* 219, 225 *P.*2d 707, 712 (1950) (finding work stoppage in case involving strike at utility company, where toll calls decreased 84.5%, local calls decreased 93%, revenues dropped 66.7%, and number of employees decreased 89%). Thus, even in those cases, loss of revenue is a reflection of the decline in services and the production of goods.

We conclude that the Board's decision not to measure lost revenue in deciding whether "a stoppage of work" occurred did not violate any of the express or implied legislative policies of *N.J.S.A.* 43:21–5(d). We next must determine whether the factual findings made by the Board are supported by the record.

### D.

We are obliged to defer to the Board when its factual findings are based on " 'sufficient credible evidence' " in the record. *Brady, supra,* 152 *N.J.* at 210, 704 *A.*2d 547 (quoting *Self v. Bd. of Review,* 91 *N.J.* 453, 459, 453 *A.*2d 170 (1982)). We are not permitted to review the case as though we were the original factfinder and substitute our judgment for any disagreements we might have with the Board. *Ibid.* Rather, we must determine whether the Board could reasonably have reached its conclusion based on the proofs. *Ibid.*

Here, the Board concluded, after a lengthy hearing before the Appeal Tribunal, "the hospital was able to operate at normal occupancy levels and the census of patients did not decrease because of the strike." Despite the hospital's loss of revenue, its need to hire replacement workers, and the temporary delay in the

receipt of grants and the opening of a laboratory, "[t]he hospital did not reduce [its] medical procedures or services" and "maintain[ed] the same quality of services to the public." The Board also noted that Lourdes "continued to release information to the public indicating that [it was] providing all of the same quality services that [it] had provided prior to the strike." Those findings are based on sufficient credible evidence in the record. Based on those findings, the Board held that Lourdes had not suffered a substantial curtailment of work and therefore the striking nurses were not disqualified from receiving unemployment benefits. Those factual and legal findings made by the Board are entitled to deference. We have no basis to disturb them.

## VI.

We therefore hold that the Board did not act arbitrarily or capriciously in concluding that Lourdes did not suffer "a stoppage of work" within the intendment of *N.J.S.A.* 43:21–5(d). Accordingly, the striking nurses qualify for unemployment benefits. For those reasons, we reverse the judgment of the Appellate Division and reinstate the decision of the Board of Review.

Justice RIVERA–SOTO, dissenting.

By judicial fiat, the majority upends the commonsense notion that striking employees have left their employment voluntarily and, hence, should be disqualified for unemployment compensation benefits. Instead, the majority upholds an award of unemployment compensation benefits to a group of striking nurses, workers who left their employment voluntarily. That determination (1) runs contrary to the basic premises of the Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.30; (2) misapprehends the import of the disqualification provisions of that Law, *N.J.S.A.* 43:21–5(d); and (3) ignores stark economic reality. For each of those reasons, I respectfully dissent.

## I.

In 1936, while this country was in the throes of the Great Depression, the Legislature adopted the Unemployment Compensation Law. *L.* 1936, *c.* 270. In doing so, the Legislature made clear that it is *"[i]nvoluntary* unemployment [which] is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family." *N.J.S.A.* 43:21-2 (codifying *L.* 1936, *c.* 270, § 2) (emphasis supplied). Construing the Unemployment Compensation Law, we have explained that "the Legislature indicated that the underlying mission of the [Unemployment Compensation Law] is 'to afford protection against the hazards of economic insecurity due to *involuntary* unemployment.'" *Brady v. Bd. of Review,* 152 *N.J.* 197, 211, 704 *A.2d* 547 (1997) (quoting *Yardville Supply Co. v. Bd. of Review,* 114 *N.J.* 371, 374, 554 *A.2d* 1337 (1989)). We also have made clear that "the purpose of the [Unemployment Compensation Law] is to provide some income for the worker earning nothing, because he is out of work *through no fault or act of his own." Id.* at 212, 704 *A.2d* 547 (quoting *Yardville Supply Co., supra,* 114 *N.J.* at 375, 554 *A.2d* 1337). That limitation—that unemployment compensation benefits are available only to those whose status as unemployed is involuntary—is codified in the Unemployment Compensation Law. *See N.J.S.A.* 43:21-5(a) (providing that "[a]n individual *shall be disqualified* for benefits ... [f]or the week in which the individual *has left work voluntarily* without good cause attributable to such work, and for each week thereafter until the individual becomes reemployed and works four weeks in employment") (emphasis supplied). *See generally, Olivieri v. Y.M.F. Carpet, Inc.,* 186 *N.J.* 511, 525-26, 897 *A.2d* 1003 (2006).

The application of those bedrock principles to this case is straightforward. Here, approximately 280 nurses employed at an operating community hospital exercised their collective bargaining and concerted employment action rights, and went on strike,

seeking to impose their will on their employer; in other words, the nurses, of their own volition, abandoned their employment for the purpose of coercing their employer to comply with their demands. That was an economic risk each of those nurses undertook voluntarily. And, that voluntary decision alone should suffice to disqualify those employees, as a matter of law, from unemployment compensation benefits.

The suggestion that striking employees nevertheless should be eligible for unemployment compensation benefits is one that has been proposed and rejected consistently. For example, as early as 1945, the reasoning that undergirds the disqualification of striking workers for unemployment compensation benefits was noted as follows:

[i]f benefits were paid to workers on strike while work at the establishment was not being done because of the dispute, it might be contended that the state was taking sides in the dispute by paying benefits to workers in recognition of their loss of wage income while doing nothing to diminish the loss to the employer because of the non-performance of work at his establishment.

[Leonard Lesser, *Labor Disputes and Unemployment Compensation*, 55 *Yale L.J.* 167, 167 n. 4 (1945–46).]

Fifteen years later, a 1960 editorial in the *New Jersey Law Journal* observed that:

Several bills which would amend the New Jersey Unemployment Compensation Law in a number of varying respects are pending action by the State Senate.

. . . .

The most controversial area of all is that of the labor dispute. The recent nationwide steel strike has prompted an increase in the demands of organized labor that strikers be made eligible for unemployment compensation. . . .

*The original purpose of the labor dispute disqualification provision in our Unemployment Compensation Law was to enable the state Unemployment Compensation Fund to remain a wholly neutral factor in labor disputes.* The apparent trend toward making the Fund a source of strike benefits raises some serious public policy questions.

[Editorial, *Public Policy and Unemployment Compensation Law Amendments*, 83 *N.J.L.J.* 240 (May 12, 1960) (emphasis supplied).]

The 1960 proposal to extend unemployment compensation benefits to striking workers was not adopted.

Seven years after that, in 1967, the highly disputed proposal to grant unemployment compensation benefits to striking workers

was adopted—but only in part—when the Legislature amended *N.J.S.A.* 43:21–5(d) to provide that, starting January 1, 1968, the disqualification for unemployment compensation benefits for striking employees would lapse once those employees had been on strike for six weeks. *L.* 1967, c. 30, § 3 (eff. Apr. 24, 1967). That amendment stirred a maelstrom of citizen discontent, which found its voice in the November 1967 election season. Chastened by the electorate, the Legislature immediately repealed that provision, explaining its reasoning as follows:

> This proposed bill provides for the elimination from the Unemployment Compensation Law of those provisions which, as of January 1, 1968, *permit compensation to workers under conditions not previously allowed.*
>
> Under the law now in effect workers unemployed due to a strike are eligible to receive full benefits after a 6–week waiting period. This act deletes this category of unemployment from the law entirely.
>
> Additionally, *the act would correct a dangerous imbalance presently existing in the procedures of free collective bargaining. By making this correction the State will once again permit employers and employees to negotiate without interference by the State in their efforts to achieve a satisfactory working contract.*
>
> [*Sponsor's Statement to Senate Bill 1, L.* 1968, c. 1 (emphasis supplied).]

In his January 31, 1968 signing statement in respect of that repealer, Chief Justice (then Governor) Hughes explained:

> I have been presented with Senate Bill 1, which amends the Unemployment Compensation Law so as to remove the provision [adopted the prior year and effective for only thirty days] permitting the payment of benefits to those on strike after a work stoppage has continued for more than six weeks, subject to certain safeguards. . . .
>
> I have reflected carefully upon this bill and have decided to sign it.
>
> In reaching this decision, I have given full and sympathetic consideration to the viewpoint of labor as well as that of the business community and, as should always be the case, to the interest of the larger public.
>
> The inclusion of strike benefits in the bill adopted last year caused in this State a certain polarization of views, sometimes strong and sharp in their expression, with regard not at all to the basic improvements in the Act, but to the single question of strike benefits. This dispute, and particularly the feelings of estrangement which accompanied it, should come to an end. Both labor and the business community, as well as the larger public to which I refer, have too much at stake in a prospering and progressive New Jersey to risk that progress in an unavailing stalemate.
>
> When the strike benefit clause was included last year, I favored such legislation in total concept because it seemed to me—and this is still my feeling—to be not only correct in principle, but also in the best interest of the State. However, it was

and is the sort of question upon which reasonable differences of opinion can exist and, moreover, can honestly exist.

This past Fall saw an election in which the question of strike benefits seemed to be projected as a clear, even a dominant, issue. And I believe *the people by their vote indicated in unmistakable terms their belief and desire that individuals on strike*—even with the safeguards provided by the Act—*should not be paid unemployment compensation.* Under our system of governmental checks and balances, without abandoning in any way the responsibility of executive authority with regard to legislation, the existence of such an apparently overwhelming consensus must be persuasive in the just exercise of that authority.

[*Signing Statement,* L. 1968, c. 1 (eff. Jan. 30, 1968) (emphasis supplied).] 1

The lesson our long history in this area teaches is clear: when confronted with the same issue as presented in this case, our Legislature and Executive responded with wisdom tempered by humility. The decision-making paradigm evident in Chief Justice (then Governor) Hughes's now forty-year-old words should be our guide, not something to be ignored or dismissed out of hand.²

---

1 Chief Justice (then Governor) Hughes's hesitation in signing *L.* 1968, *c.* 1, § 1 (eff. Jan. 30, 1968) into law was due solely to that repealer's similar repeal of the "lock-out" exception to the disqualification for benefits for striking workers. The "lock-out" exception from disqualification was reinstated pursuant to *L.* 2005, *c.* 103, § 1 (eff. Aug. 26, 2005) (codified at present *N.J.S.A.* 43:21–5(d)(2)).

2 The majority expends great effort to assert that the views expressed in this dissent "ignore[ ] this state's case law, Board of Review decisions, and the overwhelming weight of authority in this country construing provisions similar to *N.J.S.A.* 43:21–5(d)[,]" *ante* at 359, 963 *A.*2d at 301, and that this dissent "turns a blind eye" to reality, *ante* at 359, 963 *A.*2d at 301. In respect of the former accusation, one need only focus on Chief Justice (then Governor) Hughes's plain and simple words: "individuals on strike ... should not be paid unemployment compensation." Any other conclusion is nothing more than a sleight-of-hand. The latter accusation—that somehow it is the position advanced in this dissent that has ignored reality—is addressed below. *See infra* at 355–59, 963 *A.*2d at 298–301.

Finally, the majority also asserts that I "would substitute [my] own policy choices for those made by our Legislature in 1936." *Ante* at 359, 963 *A.*2d at 301. Suffice it to note that I would read the Legislature's words with both common sense and common wisdom, a process that results in the conclusion advanced here. Thus, I gladly reject the majority's tortured reasoning that turns our system of unemployment compensation benefits on its head and rewards those who voluntarily abandon their jobs. If faithfully hewing to the belief that unemployment compensation benefits are reserved solely for those who are

## II.

The majority ignores that humble wisdom and interprets *N.J.S.A.* 43:21–5(d) in a directly contradictory, and illogical, manner: as somehow allowing striking employees who voluntarily left their employment to remain eligible nevertheless for unemployment compensation benefits. That interpretation is wrong, as it is contrary to the plain language of the statute.

*N.J.S.A.* 43:21–5, titled "Disqualification for benefits," sets forth seven disqualifying criteria that render an employee ineligible for unemployment compensation benefits. First, subsection (a), as noted earlier, describes the core and mandatory disqualification from unemployment compensation benefits: an employee who leaves his employment "voluntarily without good cause attributable to such work[,]" in the stark language of the statute, "*shall be disqualified* for benefits[.]" *N.J.S.A.* 43:21–5(a) (emphasis supplied). Second, subsection (b) addresses those instances where an employee has been discharged for misconduct; it provides that an employee shall be disqualified for unemployment compensation benefits "[f]or the week in which the individual has been suspended or discharged for misconduct connected with the work, and for the five weeks which immediately follow that week[.]" *N.J.S.A.* 43:21–5(b). Third, subsection (c) penalizes those who, while receiving unemployment benefits, fail to seek or accept substitute employment; it enjoins that

> [i]f it is found that the individual has failed, without good cause, either to apply for available, suitable work when so directed by the employment office or the director or to accept suitable work when it is offered, or to return to the individual's customary self-employment (if any) when so directed by the director. The disqualification shall continue for the week in which the failure occurred and for the three weeks which immediately follow that week[.]
>
> [*N.J.S.A.* 43:21–5(c).]

Fourth, subsection (d)—the provision on which the majority relies—provides that employees involved in a labor dispute are

---

involuntarily unemployed means being accused of somehow neglecting some judicially manufactured legislative intent, it is a scarlet letter I bear proudly.

disqualified from unemployment compensation benefits unless a statutorily enumerated exception applies. It states the general rule as follows: "An individual shall be disqualified for benefits ... [i]f it is found that this unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed." *N.J.S.A.* 43:21–5(d). That provision admits of two, and only two, exceptions to the disqualification for unemployment compensation benefits to those whose unemployment is caused by "a stoppage of work which exists because of a labor dispute[.]" First, the statute exempts from disqualification those who are unemployed by reason of a labor dispute if the following two factors coalesce:

(a) The individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; *and*

(b) The individual does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided that if in any case in which (a) or (b) above applies, separate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises.

[*N.J.S.A.* 43:21–5(d)(1)(a) and (b) (emphasis supplied).] [3]

Next, subsection (d) exempts from disqualification those employees who have been "locked-out," that is, those employees who, although engaged in a labor dispute, have not gone out on strike and wish to continue to work but who are nonetheless barred from the work site by the employer. In those instances, the statutory exemption from disqualification applies if the worker "has been prevented from working by the employer, even though the individual's ... representative has directed the employees in the individual's collective bargaining unit to work under the preexisting terms and conditions of employment, and the employees had not

---

[3] Neither exception is relevant here.

engaged in a strike immediately before being prevented from working." *N.J.S.A.* 43:21–5(d)(2).[4]

Fifth, subsection (e) disqualifies a worker from receiving unemployment compensation for any period in which that employee received compensation from his employer in lieu of notice of employment termination. *N.J.S.A.* 43:21–5(e). Sixth, subsection (f) disqualifies a worker from receiving unemployment compensation during any period in which that worker is receiving unemployment compensation benefits from another source. *N.J.S.A.* 43:21–5(f). And, seventh, subsection (g) disqualifies, for a period of one year, any worker who procures unemployment compensation benefits "as the result of any false or fraudulent representation[.]" *N.J.S.A.* 43:21–5(g)(1).[5]

Focusing on the provisions of subsection (d), the majority reasons that, because the hospital/employer did not suffer a "stoppage of work" as a result of the strike, the nurses/employees were not disqualified. That reasoning turns the statute on its head.

---

[4] It is instructive that, in an amendment to the 1936 Unemployment Compensation Law proposed just three years after that Law's original passage, the amendment's sponsor described that "[t]he effect of the act as now written is to penalize any employee who desires to improve his conditions of employment by joining with a labor organization to enforce his demands for better conditions." *Sponsor's Statement, Assembly Bill 194* (1939). Although that bill was not reported out of committee, the sponsor's statement accurately describes the ultimate import of *N.J.S.A.* 43:21–5(d): unionized employees are "entitle[d] … to the benefits provided by the act, *unless they engage in a strike or walkout* [.]" *Ibid.* (emphasis supplied).

[5] The statute also recites four limited instances where voluntary unemployment will not serve as a disqualifier: (1) when the worker is in training under the Trade Act of 1974, 19 *U.S.C.* § 2296(a)(1), *N.J.S.A.* 43:21–5(h); (2) when the worker is a full-time student either attending a qualified training course or who otherwise has been employed the minimum amount required to establish a claim for benefits, *N.J.S.A.* 43:21–5(i); (3) when the worker voluntarily leaves employment as a result of being a victim of domestic violence, *N.J.S.A.* 43:21–5(j); and (4) when a worker voluntarily leaves employment in order to accompany a spouse in active military service who is transferred outside New Jersey, *N.J.S.A.* 43:21–5(k).

*N.J.S.A.* 43:21–5(d) clearly states that "[a]n individual shall be disqualified ... [i]f it is found that this unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which the individual is or was last employed." The majority, accepting the definition of "stoppage of work" adopted by the New Jersey Department of Labor, concludes that there was no "stoppage of work which exists because of a labor dispute" and, hence, the disqualification criterion in subsection (d) is not operative.

The majority's analysis is premised on the Department of Labor's regulation that defines a "stoppage of work." That regulation, *N.J.A.C.* 12:17–12.2(a), states that

"Stoppage of work" means a substantial curtailment of work which is due to a labor dispute. Justification for the labor dispute may not be considered. An employer is considered to have a substantial curtailment of work if not more than 80 percent of the normal production of goods or services is met.

Defining "stoppage of work" as a "substantial curtailment of work which is due to a labor dispute" is a sensible interpretation; because a "stoppage" is "the act of stopping or the state of being stopped[,]" *Webster's Third New International Dictionary of the English Language Unabridged* 2251 (1966), that portion of the definition appears both rational and reasonable on its face. The difficulty, however, arises from the regulatory definition of a "substantial curtailment of work" as a twenty percent reduction in output. The hospital/employer argues that there is no factual basis on which to ground that regulatory definition, and I am compelled to agree.

No doubt, administrative regulations are entitled to a presumption of validity, *N.J. State League of Municipalities v. Dep't of Cmty. Affairs,* 158 *N.J.* 211, 222, 729 *A.*2d 21 (1999). That said,

[h]owever, the deference afforded regulations does not go so far as to permit an administrative agency under the guise of an administrative interpretation to give a statute any greater effect than is permitted by the statutory language. Nor can agency regulations alter the terms of a legislative enactment or frustrate the policy embodied in the statute. If a regulation is plainly at odds with the statute, the court must set it aside. As we have repeatedly stated, the judicial role is to ensure that an agency's action does not violate express and implied legislative intent.

Thus, the meaning of enabling legislation is pivotal to any analysis of the legitimacy of a rule.

[*T.H. v. Div. of Developmental Disabilities*, 189 *N.J.* 478, 490–91, 916 *A.*2d 1025 (2007) (citations, internal quotation marks and editing marks omitted).]

And, in determining the validity of challenged administrative regulations, our point of departure is the statute's meaning and, "[o]rdinarily, we derive a statute's meaning from its language." *Id.* at 491, 916 *A.*2d 1025 (citing *State v. Sutton*, 132 *N.J.* 471, 625 *A.*2d 1132 (1993)).

Nothing in this record provides any basis whatsoever for the Department of Labor's adoption of what clearly is a totally arbitrary "80% rule" to define a "stoppage of work." Indeed, in its own answers to the public comments on this regulation, the Department of Labor boldly asserted that "[t]he rules provide that *only those individuals involved in the labor dispute will be disqualified* for benefits." *Comments of the Department of Labor, Division of Employment Security and Job Training to the proposed adoption of N.J.A.C. 12:17–12.2*, 29 *N.J.R.* 5162 (Dec. 15, 1997) (emphasis supplied). Repeatedly, the Department of Labor claimed that it "recognizes unemployment insurance as an insurance program and not an entitlement program . . . [and, therefore, i]ndividuals must contribute to the unemployment system and must meet eligibility requirements in order to receive unemployment benefits." *Ibid.* Yet, despite those clear statements of intent, nothing—absolutely nothing—in the published history of the adoption of this regulation supports the arbitrary "80% rule" adopted by the Department of Labor and on which the majority relies.

In the absence of any basis supporting the administrative rule, we must revert to the necessary starting point: the statute. And, the statutory mandate here unequivocally requires that any worker who is unemployed "due to a stoppage of work which exists because of a labor dispute" is disqualified from unemployment compensation benefits. Clearly, any plain language reading of the statute, *N.J.S.A.* 1:1–1, demands the conclusion that a worker who goes out on strike is engaged in a "stoppage of work;" at the risk

of stating the obvious, that is precisely the point of a strike, to stop work and thereby bring economic pressure to bear on an employer. Therefore, to the extent the regulations of the Department of Labor exceed a commonsense reading of the enabling statute and graph a disqualification requirement not otherwise found in the statute, that regulation is ultra vires and cannot be sustained. *See In re Freshwater Wetlands Protection Act Rules*, 180 *N.J.* 478, 488–89, 852 *A.*2d 1083 (2004).

Because the nurses/employees here voluntarily engaged in "a stoppage of work which exists because of a labor dispute" and, as a result, they were unemployed of their own volition, the plain language of *N.J.S.A.* 43:21–5(d) requires that they be disqualified for benefits, a conclusion buttressed by the only prior case in which this Court has interpreted the provisions of *N.J.S.A.* 43:21–5(d). In *Ford Motor Co. v. New Jersey Department of Labor and Industry*, 5 *N.J.* 494, 76 *A.*2d 256 (1950), this Court considered whether unemployment benefits were available to non-striking employees at two assembly plants in New Jersey. Those employees were laid-off because a labor dispute and resulting strike at different out-of-state manufacturing plants stopped the flow of materials to the New Jersey plants. The Court held that "geographical separation and the nature of the function combine to make the New Jersey plants distinct establishments within the intendment of the statutory provision under consideration." *Id.* at 505, 76 *A.*2d 256. The Court noted that the Unemployment Compensation Law provides for "*compensation where the unemployment is involuntary.*" *Ibid.* (emphasis supplied). Concluding that the New Jersey employees' unemployment was not voluntary but, instead, was caused by external forces beyond the employees' control, the Court ruled that those employees were not disqualified from unemployment compensation benefits, explaining that "[t]here was no participation in the strike here by the local unions or the individual claimants, such as constitutes a bar to relief under the statute." *Id.* at 506, 76 *A.*2d 256.

Again, the principled conclusion is inescapable: employees who voluntarily go on strike are disqualified, as a matter of law, from receiving unemployment compensation benefits. Any differing conclusion does needless violence to the core principles on which the Unemployment Compensation Law and its system of benefits are founded.

### III.

We must all remain mindful of the context of this case. Almost 280 nurses went on strike on April 19, 2004; on June 6, 2004, ninety-seven of those nurses filed for unemployment compensation benefits. Once this labor dispute was resolved, and the strike was concluded, those nurses who sought to return to their jobs were re-employed. Now, more than four years later, when the people of this State and of this Nation are confronting record unemployment levels and dismal economic prospects, the majority proposes to extend an unwarranted and unearned economic largesse to those who intentionally walked away from their jobs for the sole purpose of exerting economic harm on their employer and physical harm to the very patients these nurses were sworn to protect and serve.

Instead of applying plain common sense, the majority embraces the Department of Labor's regulation that measures whether there has been "a stoppage of work which exists because of a labor dispute" based on the amount by which the strike curtails the employer's functions. That methodology, at its core, is illogical. It is sheer perversity that this employer—a hospital—is to be penalized because it was professional and capable enough to react quickly and provide continuity of care to its patients and the community it serves. In doing so, it was caught in a quintessential Catch–22: because of the concern that a strike by healthcare professions would adversely affect innocent third parties—the patients and surrounding community—a hospital must prepare and deploy contingency plans, such that the National Labor Relations Act requires that "[a] labor organization before engag-

ing in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention[.]" 29 *U.S.C.* § 158(g). Still, the majority holds those laudable efforts by the hospital against it. That is perverse, and nothing less.

The plain and grave fact of the matter is that New Jersey faces an unprecedented unemployment compensation crisis. It recently has been reported that "[u]nemployment compensation claims are nearly double what they were this time last year, with 140,000 New Jerseyans collecting a check last week and 15,000 new claims." Steve Chambers, "Corzine orders more staffing to handle unemployment claims," *The Star–Ledger,* Dec. 6, 2008, *available at* http://www.nj.com/starledger/stories/index.ssf?/base/news–14/1228541733222950.xml&coll=1. This surge in unemployment compensation claims has required that the State "deploy 130 workers, some new hires and others transfers from across state government, to deal with a growing backlog of unemployment claims." *Ibid.*[6] The inevitable, of course, now has occurred: "A surge in jobless claims has battered the fund that bankrolls unemployment benefits in New Jersey, exhausting all of the $260 million emergency infusion sent five months ago and raising the prospect taxpayers will be asked for more." Dunstan McNichol, "Surge in jobless claims taps out New Jersey unemployment fund," *The Star–Ledger,* Dec. 8, 2008, *available at* http://www.nj.com/news/ledger/topstories/index.ssf/2008/12/surge_in_jobless_claims_taps_o.html. Although "[b]usinesses currently pay about $2 billion a year into the fund," "[i]f the fund's balances continue to decline, businesses will face an automatic $400 million tax hike next June [when a] similar increase on businesses was averted this year by the state's $260 million infusion." *Ibid.* The trend is

---

[6] New Jersey does not stand alone in this crisis. *See, e.g.,* Patrick McGeehan, "State's Unemployment System Buckles Under Surging Demand," *N.Y. Times,* Jan. 7, 2009, *available at* http://www.nytimes.com/2009/01/07/nyregion/07unemployment.html?_r=1&ref=nyregion.

frightening: "At its peak about four years ago, the fund contained $3 billion. But before the state's cash infusion earlier this year, its balance had sunk to $161 million—not even enough to meet one month's worth of claims." *Ibid.* And, New Jersey is not alone; it was recently reported:

> With unemployment claims reaching their highest levels in decades, states are running out of money to pay benefits, and some are turning to the federal government for loans or increasing taxes on businesses to make the payments.
>
> Thirty states are at risk of having the funds that pay out unemployment benefits become insolvent over the next few months, according to the National Association of State Workforce Agencies. Funds in two states, Indiana and Michigan, have already dried up, and both states are borrowing from the federal government to make payments to the unemployed.
>
> [Jennifer Steinhauer, "State's Funds for Jobless Are Drying Up," *N.Y. Times*, Dec. 15, 2008, *available at* http://www.nytimes.com/2008/12/15/us/15funds.html.]

That is the bleak reality that informs this Court's decision today. We have made clear that

> [a]lthough the [Unemployment Compensation Law] is to be liberally construed in favor of claimants to effectuate its remedial purposes, we have emphasized that it is also important to preserve the unemployment insurance trust fund against claims by those not intended to share in its benefits. The basic policy of the law is advanced as well when benefits are denied in improper cases as when they are allowed in proper cases. The [Unemployment Compensation] Act, then, is designed to serve not simply the interest of the unemployed, but also the interest of the general public. To give the correct interpretation of this policy, the Court must carry in mind the dire and distressing situations against which the statute, as a matter of stated public policy, is directed.
>
> [*Brady, supra,* 152 *N.J.* at 212, 704 *A.*2d 547 (citations, internal quotation marks and editing marks omitted).]

The Unemployment Insurance Fund is neither designed nor intended as a substitute strike fund for those who chose to exercise their collective bargaining and strike rights; its purpose is to provide assistance solely to those who lose their jobs through no fault of their own. Only an exquisite irony would require an employer to pay into a fund that will subsidize those who wish to do that employer harm. Yet, that is the very result the majority endorses. Because I cannot join in this unmerited and unwise extension of unemployment compensation benefits—at any time, and much less at a time of grave economic distress when those funds should be reserved for those rightly entitled to them—I

would remand the cause to the Board of Review for the entry of an order denying unemployment compensation benefits to these applicants.

## IV.

New Jersey's unemployment compensation system of benefits is designed to assist those workers who lose their jobs through no fault of their own, that is, those whose unemployment is involuntary. If that is so, then the proposition that unemployment compensation benefits should be made available to a worker who voluntarily leaves his or her job is plainly without support, particularly when the reason for the employee's voluntary leaving is to engage in a strike. Yet, based on notions foreign to the clear dictates of the Unemployment Compensation Law, the majority cobbles together an illogical result. In short, the majority's determination awarding unemployment compensation benefits to these applicants (1) runs counter to the basic premises of the Unemployment Compensation Law, *N.J.S.A.* 43:21–1 to –24.30; (2) misapprehends the import of *N.J.S.A.* 43:21–5(d); and (3) ignores stark economic reality. For each of those reasons—both individually and collectively—I respectfully dissent.

*For reversal and reinstatement*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*For affirmance*—Justice RIVERA–SOTO—1.